**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MEGHAN E. KLEIN, individually and in her capacity as Executrix of the ESTATE OF MICHAEL P. DONATUCCI<br>629 Swedesford Road<br>Malvern, PA 19355<br><br>*Plaintiffs*<br><br>*vs.*<br><br>RONALD R. DONATUCCI, SR., ESQUIRE, individually and in his capacity as REGISTER OF WILLS OF THE CITY OF PHILADELPHIA and CLERK OF THE ORPHANS' COURT DIVISION OF THE COURT OF COMMON PLEAS OF PHILADELPHIA<br>Room 180, City Hall<br>Philadelphia, PA 19107; and<br><br>CITY OF PHILADELPHIA<br>1515 Arch Street, 14th Floor<br>Philadelphia, PA 19102; and<br><br>RONALD R. DONATUCCI, JR.<br>3515 Capri Court<br>Philadelphia, PA 19145; and<br><br>RONALD MICHAEL RONALD, L.P.<br>104 Queen Street<br>Philadelphia, PA 19147; and<br><br>RRM ASSOCIATES, LLC<br>104 Queen Street<br>Philadelphia, PA 19147; and<br><br>WILMINGTON SAVINGS FUND SOCIETY, FSB<br>1 West Lancaster Avenue<br>Paoli, PA 19301; and | **CIVIL ACTION**<br><br><br>**NO. _____**<br><br><br><br>**COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

DEBRA J. FOGLIETTA
1402 E. Moyamensing Avenue, Unit 3
Philadelphia, PA 19107; and

JAMES F. MANNION, ESQUIRE
1755 Thistle Way
Malvern, PA 19355; and

MANNION PRIOR, LLP
840 First Avenue, Suite 100
King of Prussia, PA 19406-1459; and

FRANK DeSIMONE, ESQUIRE
123 S. Broad Street, Suite 2500
Philadelphia, PA 19109; and

BRIMFIELD CAPITAL, LLC
45 Brimfield Road
Audubon, PA 19403; and

HAU-KAY T. SIU
45 Brimfield Road
Audubon, PA 19403

*Defendants*

Plaintiff Meghan E. Klein, individually, and in her capacity as the Executrix of the Estate

of Michael P. Donatucci, deceased (the "Estate"), respectfully submits this Complaint and alleges

as follows:

## INTRODUCTION

1.      This is a 42 U.S.C. § 1983 lawsuit, with pendent state claims, to enjoin and recover for the

continuing gross abuse of power by Defendant Ronald R. Donatucci, Sr., Esquire ("Donatucci"),

the Register of Wills of Philadelphia and Clerk of the Orphans' Court Division of the Court of

Common Pleas of Philadelphia. Specifically, Donatucci, who probated his son's Will, is misusing

the power of his office to harass the Plaintiff, Meghan E. Klein, the young and grieving fianceé

(and girlfriend of more than 10 years) of Donatucci's son, Michael, who committed suicide in July 2016, two months prior to their wedding date. Meghan was named by her fiancé to be the Executrix and primary beneficiary of his Estate. His mother is the only other beneficiary of his Estate.

2.      Donatucci has worn many hats over the years. In particular, in addition to serving as Register of Wills for nearly 40 years, Donatucci is in the real estate business. He, along with his two sons, Michael and Ronald R. Donatucci, Jr. ("Donatucci Jr."), were partners in numerous commercial real estate projects in the City of Philadelphia, through limited liability companies and other business entities, and they managed those properties through a family real estate business, Debro Investments.

3.      Under Michael's Will (which Donatucci, again the Register of Wills, initially tried to hide), Meghan, along with Michael's mother (Donatucci's ex-wife), inherited Michael's minority interests in those properties.

4.      From the moment that Michael's death was revealed, Donatucci's one goal has been to remove Meghan as Executrix and to strong arm her into surrendering primarily her inherited real estate interests.

5.      One of the driving forces of this scheme has been to deprive her of information regarding Michael's shared business interests with his father. Donatucci has gone to extreme lengths to hide information from Meghan, including taking possession of Michael's phone and email accounts (including changing passwords) upon his passing and withholding them from the Executrix, Michael's grieving fiancée, despite the fact that she was also specifically named digital executrix in Michael's Will. It took multiple court orders to compel Donatucci's cooperation in this regard, though it remains unclear as to whether information was tampered with, altered, or destroyed by Donatucci and/or others at his direction, including Donatucci Jr.

6.       Donatucci has used the power of his office to interfere with Meghan's rights and is attempting to terrorize her into surrendering her to-be-inherited interests for almost nothing. Because of his long-standing position, Donatucci has enormous political power in the Philadelphia legal community. From the moment of Michael's passing, Donatucci directed official actors to doing his bidding so that he could obtain a personal advantage with regard to his business dealings with Michael – a classic abuse of power.

7.       On July 15, 2016, in the hours after Michael's apparent suicide (he purportedly killed himself at the apartment that he shared with Meghan), Donatucci directed the removal and replacement of police officers of the Philadelphia Police Department who were investigating Michael's death at the apartment (which is adjoined to Donatucci's home in the Queen Village section of Philadelphia), with police officers friendly to Donatucci. Donatucci and City employees from the Register of Wills Office, at the direction of Donatucci, removed belongings of Michael and Meghan from the apartment over a period of time beginning on the date of Michael's passing (including at the crime scene). Most critically, they took Michael's Will and cell phone which contained emails, text messages and voicemails, which are relevant to the business disputes between Meghan, as the beneficiary, and Donatucci. Of course, Donatucci did not want Meghan to see the Will which appointed her Executrix and made her the principal beneficiary of Michael's Estate. If not for an email that Michael had sent prior to his death with a delivery date set for after his death via a program called Boomerang, the Will would have been kept from Meghan by Donatucci.

8.       Similarly, on the days following Michael's death, City employees and Donatucci Jr. removed, among other things, Michael's laptop, USBs and files, which also contained information

relevant to the later business dispute between Meghan and Donatucci, none which has been returned to the Executrix. All were taken in contravention of the law.

9.    At the same time, using his official power as a form of intimidation, Donatucci obtained items of Michael's from Michael's employer, the Philadelphia Pension Fund, without informing Meghan as the Executrix. The Pension Fund refused to turn over to the Executrix Michael's personal belongings and USBs, ultimately providing her only with redacted copies.

10.    Notwithstanding that he is the Register of Wills and should have immediately recused himself at the inception, Donatucci insisted that Meghan file the Will (that he initially stole and tried to suppress) for probate at his office. Shortly thereafter, Donatucci attempted to strong arm Meghan into selling to him Michael's real estate interests (including those Michael owned independent of Donatucci) for a fraction of their value and also into relinquishing her role as Executrix. When she refused to do so, he used the power of his office to harass and persecute her.

11.    One of many examples is that Donatucci interfered with the Estate's contractual relations in the real estate project regarding a property owned by the Estate in which Donatucci had no interest but wished to obtain for himself. Specifically, Donatucci used the power of his office in order to intimidate, influence, coerce, or persuade the bank that served as mortgagee for the business entity owning the property, Wilmington Savings Fund Society, FSB ("WSFS"), into attempting to declare a default for no good reason so that Donatucci could obtain the property for himself. This has been the unfortunate pattern of conduct.

12.    Similarly, directing a former FBI agent who is aligned with him to carry the message, Donatucci threatened Meghan's then counsel, the Philadelphia law firm Conrad O'Brien, P.C. (the "Conrad Firm"), which resulted in the Conrad Firm withdrawing as counsel to Meghan and the Estate in various state court litigations, including several between Meghan and Donatucci. The

threat to the Conrad Firm was very simple – stop representing Meghan or you will be punished by the Donatucci political machine.

13.     In April 2017, upon Meghan filing the inheritance tax return regarding the Estate with the Pennsylvania Department of Revenue, Donatucci was unlawfully tipped off as to the filing and equally unlawfully obtained a copy of the return from the Department of Revenue for his personal use. Donatucci then meddled with the inheritance tax filing by communicating with the Department of Revenue.

14.     As recounted below, there are various state court proceedings between Donatucci, nominally in his capacity as a former business partner of Michael, and Meghan, as the person who is to inherit Michael's business interests (and who is attempting to carry out her duty to Michael's mother who also is to inherit a portion of Michael's interest). But at all times, the reality is that Meghan is not litigating against a person who is merely named Donatucci – she is litigating against the Register of Wills of the City of Philadelphia of nearly the last 40 years – an individual cloaked in governmental power and who has raw political power even greater than technically afforded him by his position.

15.     The bottom line is that Donatucci wields so much political power because of his official position that Meghan cannot receive equal treatment under the law. This case is the very reason why there are federal courts – when state and local actors so abuse their power that the only recourse is a federal court. Donatucci has turned the state court system in and around Philadelphia into Mississippi right after reconstruction ended.

16.     What should have been a routine business divorce between a beneficiary and the majority partner of various real estate entities has turned into a persecution by one of the most powerful

political figures in Philadelphia against a bereaved fiancée. This must stop and only federal power can right this imbalance.

17.     Thus, Meghan has come to this Court to enjoin this pattern of governmental abuse and to have this Court adjudicate her disputes with Donatucci, because they cannot be fairly judged in the state and local courts in Philadelphia.

18.     Thus, in addition to injunction and damages, under her § 1983 claims, she is also seeking a partition of the interests in the business entities that she has inherited and owns jointly with Donatucci and a recovery in various state law claims. These pendent claims are not only related to the § 1983 action, but are inextricably bound by it as described above. Only this Court can grant her the unbiased relief that she needs free of Donatucci's intimidation.

## THE PARTIES

19.     Plaintiff Meghan E. Klein is a resident of Lafayette Hill, Montgomery County, Pennsylvania.

20.     The Estate was probated in Philadelphia and maintains an address in Malvern, Chester County, Pennsylvania.

21.     Defendant Ronald R. Donatucci, Sr., Esquire, is an adult individual, an attorney licensed in Pennsylvania, and an employee of the City of Philadelphia, and he is sued in his individual capacity and in his capacity as the Register of Wills and Clerk of the Orphans' Court ("Donatucci"). He resides in Philadelphia, Pennsylvania. Donatucci is Michael's father.

22.     Defendant City of Philadelphia ("City") is a municipal corporation, duly organized under the laws of the Commonwealth of Pennsylvania, and is the employer of Donatucci, in his capacity as the Register of Wills and Clerk of the Orphans' Court.

23.    Defendant Ronald R. Donatucci, Jr. ("Donatucci Jr.") is an adult individual who resides in Philadelphia, Pennsylvania. He is Donatucci's son, and is Michael's brother.

24.    Defendant Ronald, Michael and Ronald, L.P. is a limited partnership with its principal place of business in Philadelphia, Pennsylvania. At the time of Michael's death, the limited partners of Ronald, Michael and Ronald, L.P., in addition to Michael (33%), were Donatucci (33%), and Donatucci Jr. (33%), and the general partner is Donatucci (1%).

25.    Defendant RRM Associates, LLC is a Pennsylvania limited liability company with its principal place of business in Philadelphia, Pennsylvania. At the time of Michael's death, the members of RRM Associates, LLC, in addition to Michael (33%), were Donatucci (34%) and Donatucci Jr. (33%). The managing member of RRM Associates, LLC is Donatucci.

26.    Defendant Wilmington Savings Fund Society, FSB ("WSFS" or "Bank") is a federal savings bank with offices located in Philadelphia and its surrounding counties in Pennsylvania. WSFS was the mortgagee on a certain piece of real estate in which Michael had a majority interest.

27.    Defendant Debra J. Foglietta ("Foglietta") is an adult individual who resides in Philadelphia, Pennsylvania. Foglietta is Michael's mother.

28.    Defendant James F. Mannion, Esquire is an adult individual and an attorney licensed in Pennsylvania who is sued in his individual capacity and in his capacity as a partner in Defendant Mannion Prior. He maintains his office in King of Prussia, Montgomery County, Pennsylvania and resides in Malvern, Chester County, Pennsylvania.

29.    Defendant Mannion Prior, LLP is a law firm with its principal place of business located in King of Prussia, Montgomery County, Pennsylvania. James F. Mannion, Esquire and Mannion Prior are counsel for Donatucci, and they are hereinafter separately or together referred to as "Mannion."

30.     Defendant Frank DeSimone, Esquire ("DeSimone") is an adult individual and an attorney licensed in Pennsylvania. He maintains his office in Philadelphia and resides in Bryn Mawr, Montgomery County, Pennsylvania. DeSimone is counsel for Foglietta.

31.     Defendant Brimfield Capital, LLC ("Brimfield") is a Pennsylvania limited liability company with its principal place of business located in Audubon, Montgomery County, Pennsylvania.

32.     Defendant Hau-Kay T. Siu ("Siu") is an adult individual who resides in Audubon, Montgomery County, Pennsylvania. Based on information and belief, Siu and his wife, Katy Siu, are, and at relevant times were, the sole members of Brimfield. Brimfield is the minority member in Penn Peak Capital, LLC in which Michael was a majority member.

## JURISDICTION AND VENUE

33.     Jurisdiction over Plaintiffs' federal claims is based on 28 U.S.C. § 1331 and 1343(a).

34.     Jurisdiction over Plaintiffs' state law claims is based on 28 U.S.C. § 1367(a), as such claims are related to the federal claims in this instant action within such original jurisdiction of the Court that they form part of the same case or controversy under Article III of the United States Constitution.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that the Defendants reside in this judicial district or in Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district, as alleged below.

## FACTUAL ALLEGATIONS

### A.     MICHAEL'S TRAGIC DEATH AND SUBSEQUENT EVENTS

36.     Michael died on July 15, 2016, tragically having taken his own life.

37.     At the time of his death, Michael and Meghan had been dating for more than 10 years, since college, and were due to be married on September 24, 2016.

38.     At that time also, Michael, a Chartered Financial Analyst, was serving as the Chief Investment Officer of the Philadelphia Board of Pensions and Retirement ("Philadelphia Pension Fund"), having started that position on June 1, 2016 after about eight years working with the institutional group at SEI Investments in Oaks, Pennsylvania.

39.     Michael's Will named his fiancée, Meghan, the Executrix of his Estate.

40.     At the time of Michael's death, Michael and Meghan shared an apartment, one of two apartments connected to Donatucci's home in Queen Village in South Philadelphia.

41.     Meghan found Michael in their bathroom on the evening of July 15, 2016, dead from an apparent gunshot wound to the head, upon her arrival home from work. It was determined that Michael died earlier that afternoon in their apartment.

42.     Based on information and belief, Donatucci's surveillance cameras indicate that Michael arrived home to the apartment that afternoon at almost the same time as Donatucci himself.

43.     That evening, upon Meghan finding Michael and following the police's arrival at the scene, Donatucci directed that police investigating Michael's death be removed from the premises and replaced by other police with whom he was familiar, and he, members of his family, friends, and city employees entered the apartment Michael and Meghan shared and went through and removed their belongings, including Michael's cell phone and Will. Donatucci and City employees under his control, and Donatucci Jr. continued to access and remove items from the apartment in the days and weeks that followed, without Meghan's permission and over her objection.

44.     Michael's Will was in his "Tumi bag" (per an email from Michael, discussed below) in the apartment he shared with Meghan at the time of his death on July 15, 2016.

45.    Donatucci took from the apartment Michael's Tumi bag (containing his Will) and Michael's cell phone, among other items, and brought them into his home on July 15, 2016.

46.    Donatucci took possession of Michael's Will on the evening of July 15, 2016 and was fully aware of its contents on that date and the days that followed, and Donatucci hid it from Meghan as he went about planning Michael's funeral in the following days without any input from her.

47.    Michael's Will may never have been discovered but for an email Michael sent delayed (via a program called "Boomerang") to Meghan, Donatucci, and Michael's mother, Foglietta, for delivery on July 18, 2016, three days after Michael's death. Michael's email directed that the original of his Will was in his Tumi bag.

48.    It was not until after this email was received by Donatucci that he returned the original Will to the apartment.

49.    As regards Michael's cell phone, despite promising many times to deliver it to Meghan, who, according to Michael's Will was also named Executrix of Michael's <u>digital</u> assets (in addition to being Michael's fiancée), Donatucci refused to allow her to even see it and maintained possession of the phone until recently.

50.    Only recently, after two Orders dated June 12, 2018 and December 13, 2018 were issued by the Honorable Ronald C. Nagle, Senior Judge of the Court of Common Pleas of Chester County (who upon Plaintiffs' petition, was appointed to preside over Orphans' Court proceedings regarding this Estate, discussed *infra*), did Donatucci turn over Michael's phone after having handled and possibly having tampered with its data.

51.    Donatucci had left Michael's cell phone in the possession of his City employee, Emilio DiGregorio ("DiGregorio"), who had complete and unfettered access to the information on the phone and to Michael's email and other accounts, to the exclusion of Plaintiffs. The cell phone

and various accounts were searched by DiGregorio at Donatucci's direction and the passwords to Michael's email accounts were changed by Donatucci, preventing Meghan from accessing the accounts. Nothing that was in Michael's possession should have been handled and possessed by anyone other than Meghan, who, as mentioned, stands in Michael's place as the Executrix and "Digital Executor" of his Estate. As an attorney admitted to the Bar in Pennsylvania and as the Register of Wills responsible for admitting Michael's Will to probate and issuing Letters Testamentary to Meghan, Donatucci well knows this.

52.     On information and belief, in about December 2018, without right, or notice to or permission of Plaintiffs, Donatucci, Mannion, and Mannion Prior took, tampered with, and/or copied information in Michael's cell phone and Michael's email and other accounts, and they have refused to turn over the copies they made despite Plaintiffs' request.

### B.     <u>MICHAEL'S WILL ADMITTED TO PROBATE BY DONATUCCI</u>

53.     Michael's Will named two beneficiaries:

> First, his mother, Debra J. Foglietta (Donatucci's ex-wife), who is the sister-in-law of the Honorable Angelo Foglietta, a Judge of the Court of Common Pleas of Philadelphia and close friend of Donatucci's; and

> Second, his fiancée, Plaintiff Meghan E. Klein.

54.     Michael's father, Donatucci, and Michael's mother, Foglietta, divorced in the early 1990s and have had a historically contentious relationship.

55.     Neither Michael's father nor his brother, Donatucci Jr., are beneficiaries of the Estate.

56.     Foglietta's interest in the Estate consists of a 25% share of Michael's interests in real estate he held with his father, Donatucci, and brother, Donatucci Jr. ("Michael's Commonly-Held Realty Interests").

57.     The other 75% share of Michael's Commonly-Held Realty Interests was left to Meghan, as were two properties in which Michael was a 100% owner (the "20th Street Property") or majority owner (the "Girard Avenue Property"), plus all other accounts and assets of the Estate. Meghan is also the residuary beneficiary under Michael's Will.

58.     On August 11, 2016, following a meeting insisted upon by Donatucci, Michael's Will was admitted to probate by Donatucci, acting in his official capacity as Register of Wills, a position which he has held for nearly 40 consecutive years, and following the probate, Letters Testamentary were granted to Meghan as Executrix by Donatucci.

59.     Despite the foregoing, as shown below, Meghan has been under attack by Donatucci.

### C.     DONATUCCI'S WITHHOLDING OF ASSETS BELONGING TO PLAINTIFFS

60.     By statute, one aspect of Meghan's fiduciary duty as Executrix is to "take possession of, maintain and administer all the real and personal estate of the decedent." 20 Pa. C.S.A. § 3311. In other words, Meghan bears the responsibility to "preserve and protect the property for distribution to the proper persons within a reasonable time." *In re Estate of Campbell*, 692 A.2d 1098, 1101 (Pa. Super. 1997). As Register of Wills and Clerk of the Orphans' Court, Donatucci knows this.

61.     As Executrix, Meghan has the right to take possession of all assets, items and personal papers, documentation, and things of Michael's personal estate. 20 Pa. C.S.A. § 3311. She also has a right, individually, to take possession of her own personal belongings. As Register of Wills and Clerk of the Orphans' Court, Donatucci knows this.

62.     As Executrix, Meghan has the right to require the production of information, documentation, and things by Donatucci as part of her inherent powers and duties under 20 Pa. C.S.A. § 3332. This includes those documents and things that Donatucci took from Michael and Meghan without permission, as well as information and things Donatucci owes to Plaintiffs by

virtue of Plaintiffs' interest in real estate they own with Donatucci. As an attorney, Register of Wills, and Clerk of the Orphans' Court, Donatucci knows this.

63.     Indeed, the Register of Wills' website specifically states that the role of the "personal representative," or Executrix in this case, includes "locating and protecting the assets of the estate." Emphasis added. Donatucci has no right to dictate what Estate assets, information, and things will be produced and how they will be produced.

64.     Since Michael's death, despite Meghan's request that Donatucci not enter Michael and Meghan's apartment without her, Donatucci (and others at his direction, including Donatucci's family members – including Donatucci Jr., friends, and city employees – including Claudine Catalano ("Catalano") (and her husband, Thomas Pipino), Damian Ruth ("Ruth"), and others) have entered Meghan and Michael's apartment numerous times without notice or permission and have taken assets owned by Plaintiffs, including Michael's laptop, USBs and files, and other personal belongings. Donatucci's actions violate the Philadelphia Renter's Handbook and constitute trespassing and violations of Meghan's privacy rights, among others. As an owner of Debro Investments (through which Donatucci's real estate holdings are managed), former Chief of Enforcement for the City's Department of Licenses and Inspections, as well as Register of Wills and an attorney, Donatucci knows this conduct is not proper. As noted above, Michael's cell phone and Will were also taken by Donatucci on the day Michael passed, and Michael's cell phone and email accounts have been possessed and handled by at least one City employee, DiGregorio, at Donatucci's direction.

65.     Donatucci has changed the lock on the apartment Meghan and Michael shared and has failed to provide Meghan with a new set of keys so that she could obtain her and Michael's belongings.

66.    Donatucci also instructed his City employee, Damian Ruth, to remove some of Meghan and Michael's belongings from the apartment, again without notice to Meghan and without her permission.

67.    As noted, Donatucci or City employees at his direction accessed and changed the passwords on Michael's email accounts, blocking Meghan from accessing the accounts even though, according to Michael's Will, she is the Executrix and beneficiary of Michael's <u>digital</u> assets. Donatucci denied doing so to the Orphans' Court. He was eventually caught in this lie when, under court orders, he was recently forced to turn over the new passwords he created for Michael's email accounts.

68.    Donatucci has also taken Michael's possessions from his office at the Pension Fund.

69.    In addition, Donatucci has taken or prevented Plaintiffs from possessing information and data regarding Michael's Commonly-Held Realty Interests, including records from Michael's Quickbooks accounts which Michael instituted for the family real estate business, Debro Investments, and he is doing so despite clear and direct orders issued by Judge Nagle to turn over such information and data to Plaintiffs. Donatucci has likewise taken rents owed to Plaintiffs from certain real estate in which they have an interest. Donatucci has deliberately taken or prevented Plaintiffs from possessing the rents and other records and things to prevent Plaintiffs from conducting a complete and accurate evaluation of Michael's Commonly-Held Realty Interests, among other things such as completing tax returns. This conduct is illegal and improper. Donatucci (as an attorney, Register of Wills, and Orphans' Court Clerk) and his counsel, Mannion, know this.

70.    Donatucci is also aware of and cooperating in Michael's brother, Donatucci Jr.'s, failure to pay Plaintiffs a debt which Michael had difficulty collecting from his brother prior to his death. Despite being aware of Michael's struggle in this regard, Donatucci has demanded that the

Plaintiffs release Donatucci Jr. of this debt without payment (and without any supporting documentation).

71.     Relevant documents and files, as well as Meghan and Michael's belongings, continue to be withheld from Plaintiffs by Donatucci and Mannion, despite Meghan's many requests, two Orders issued by Judge Nagle, and two Orders issued by the Chester County Court of Common Pleas in litigation regarding the Girard Avenue Property.

72.     Donatucci has claimed in response to discovery in the state court case regarding the Girard Avenue Property in Chester County that he destroyed his communications with other defendants in the state court action regarding the Estate. This conduct is illegal and improper. Donatucci (as an attorney, Register of Wills, and Orphans' Court Clerk) and Mannion know this.

73.     Documents, data, and things belonging to Plaintiffs are believed to have also been destroyed by Donatucci, or by others at his direction. These items have likewise not been turned over to the Estate, despite Plaintiffs' requests and Judge Nagle's Orders.

74.     Donatucci has shown a pattern of failing or refusing to cooperate with court orders in regard to this Estate and other matters. The dockets of Courts of Common Pleas in Pennsylvania reflect Donatucci has failed to comply with discovery and court orders compelling discovery, including in a pending case Plaintiffs recently discovered was filed against Meghan, Donatucci, Donatucci Jr., and others bearing on a property in which Plaintiffs have an interest (1179 S. 13th Street in Philadelphia), and it appears from the docket in that case that Donatucci accepted service on behalf of Meghan in October 2017 without Meghan's consent. *See Saulin-Frock et al. v. Donatucci et al.*, August Term 2016, No. 1133.

75.     At the end of 2018, Judge Nagle retired. The President Judge of the Court of Common Pleas of Philadelphia has yet to take any action to see that a fair and impartial judge replace him

16

to handle various pending Estate matters, including Meghan's pending petition for sanctions, Donatucci's contempt of the two Orphans' Court Orders mentioned above, and a baseless petition Donatucci filed in 2017 (discussed *infra*) to have Meghan removed as Executrix and Donatucci appointed as executor in her place. For reasons discussed *infra*, the integrity of the state court system to handle these matters is compromised by Donatucci's involvement.

76.     As recently as January 2019, Meghan demanded again that Donatucci fully comply with Judge Nagle's Orders, including that Donatucci turn over copies Meghan recently learned Donatucci and Mannion made of Michael's cell phone and email accounts without notice to her and without her permission (no chain of custody information regarding those items has been provided either, despite Meghan's request). Donatucci failed to respond or comply with the Orders, and, on information and belief, Donatucci is now using his power to influence the assignment of a new judge, which he plans to use to his advantage in these various matters.

77.     Donatucci and Mannion have been uncooperative throughout the Orphans' Court proceedings, having twice obtained stays of those proceedings, including based on a false promise to Judge Nagle and Plaintiffs that Donatucci would turn over everything he has taken from Plaintiffs. Donatucci and Mannion used the stays only to continue the scheme to unfairly leverage and extort a deal for Donatucci and Mannion's benefit.

78.     This pattern of conduct, including but not limited to Donatucci's and Mannion's threats and other meddling in matters undermining Plaintiffs' rights, is prejudicing Plaintiffs and violating their constitutional rights to privacy, property, and access to the courts, including to counsel.

### D.     DONATUCCI'S MEDDLING IN THE ESTATE'S AFFAIRS

79.     Unbeknownst to Plaintiffs at the time, Defendants began meddling in the Estate's affairs in the summer of 2016, shortly after Michael died.

80.    Donatucci meddled in the Estate's ownership of the Girard Avenue Property. This Property was owned by Penn Peak Capital, LLC ("Penn Peak"), in which Michael was majority member and Brimfield (controlled by Siu) was minority member ("Brimfield/Siu").

81.    Defendant WSFS was the mortgagee on the Girard Avenue Property, which had been conservatively appraised by WSFS for $460,000 in early 2016. The loan balance on the date of Michael's death was approximately $325,600.

82.    Donatucci has a long standing relationship with WSFS, which is also the mortgagee on a number of Donatucci's and Donatucci Jr.'s real estate holdings. WSFS, including its vice president, Herb Matter ("Matter") has been intimidated, influenced, coerced or persuaded into conspiring with Donatucci because of Donatucci's official power.

83.    On August 26, 2016 and days following, within almost a month of Michael's passing, Meghan was in contact both in person and by phone with WSFS to make the mortgage payments as well as obtain information regarding the loan. Despite providing the necessary paperwork to prove Michael's death as well as her position as Executrix, the Bank refused her payment and refused to provide her with information. Meghan was told by WSFS that she would have to prove her ownership in Penn Peak if she wanted to make payments or obtain loan information. At the time, Meghan did not have access to a copy of the Penn Peak Operating Agreement. WSFS in fact already had a signed copy of the Operating Agreement in its file, but the Bank refused to respond to Meghan's inquiries about the loan or to accept her payments without her producing a separate copy of the Operating Agreement to the Bank.

84.    Unbeknownst to Meghan at that time, Donatucci was communicating with WSFS and Brimfield/Siu about a plan for him to take over the Girard Avenue Property (in which he had no

legal or equitable interest) and was influencing the Bank's improper treatment of Meghan, including blocking her payments.

85.     Indeed, the Bank was acting at Donatucci's bidding, following his every request because of his official position and for the Bank's own economic advantage. Donatucci wanted the Bank to declare a default so that Meghan would have to sell her interest to him cheaply or so he could buy it from the Bank after foreclosure.

86.     On September 18, 2016, Donatucci proposed directly to Meghan that he would pay her a nominal sum over an extended period of time for all of Michael's Commonly-Held Realty Interests, plus the two properties in which Donatucci had no interest, i.e., the Girard Avenue Property (which belonged to the LLC, Penn Peak) and Michael's 20th Street Property (which Michael owned outright). Donatucci's proposal was also contingent on Meghan allowing him to take over as executor of Michael's Estate, so that, among other things (including controlling information and things of the Estate), he could cheat his ex-wife, Foglietta out of her inheritance by paying her a nominal sum for her share of Michael's Commonly-Held Realty Interests. His offer not only severely undervalued Michael's Commonly-Held Realty Interests (which were determined to have a net value of close to $2 million by Michael, who was proficient in real estate valuation, before he passed), but also severely undervalued the Girard Avenue and 20th Street properties. Meghan's refusal to accept Donatucci's deal and her unwillingness to serve as either chair or a member of the board of a foundation that Donatucci initiated on the day of Michael's death angered Donatucci, who, unbeknownst to Meghan at the time, immediately set out to retaliate against her by sabotaging Meghan's efforts to carry out her fiduciary duties in order to gain control of the Estate, including primarily Michael's valuable real estate assets, as well as

attempt to maintain his control of the information and things he did not wish to turn over to Meghan (significantly, the information on Michael's cell phone and in Michael's email accounts).

87.    Various iterations of Donatucci's demands were repeated in calls and writings by Donatucci's counsel, Mannion and Mannior Prior (hereinafter together referred to as "Mannion") and his solicitor at the Register of Wills office, Charles Golden, Esquire ("Golden"), who purported to represent Foglietta and indicated she supported Donatucci's demands.

88.    Because Donatucci, on his own and through Mannion and Golden, was unable strike a deal for himself with Meghan, Donatucci (with the help of Mannion) commenced a scheme to take over the Girard Avenue Property, and ultimately the Estate, soliciting the support of Brimfield/Siu and WSFS, who were both willing to oblige for their own selfish gain.

89.    As part of the scheme, WSFS delayed accepting Meghan's payments until September 16, 2016, after informing Meghan that the loan was in default for nonpayment of installments due, despite Meghan's prior efforts to make the payments.

90.    After Meghan confronted WSFS about its improper refusal to receive her payments, WSFS accepted her payment, and WSFS led her to believe there were no other issues with the loan nor would there be if Meghan continued making payments by the 25th day of each month to keep the loan current pending her disposition of the Property (as Meghan and Brimfield/Siu agreed), i.e., the same monthly payments Michael had made before his demise. These were the terms the Bank told Meghan would apply to the loan, and on which she reasonably relied. The terms required by the Bank were met in good faith each month by Meghan since Michael's passing and through the date she ultimately sold the property.

91.    The Bank is withholding communications between Donatucci and the Banks' vice president, Matter, and, as mentioned above, Donatucci claims he destroyed his written

communications regarding the Estate and, specifically, the Girard Avenue Property. These acts of obstruction and hiding or destroying evidence are in furtherance of Donatucci's scheme against Plaintiffs.

92.    As Executrix, Meghan paid and continued to pay 100% of all outstanding debts on behalf of Penn Peak, including mortgage payments to the Bank, property and liability insurance, real estate taxes, utilities, building maintenance, and professional fees. Consistent with Donatucci's scheme, in order to put financial pressure on Meghan, the minority member in Penn Peak, Brimfield/Siu, contributed no funds since Michael's passing (and has contributed nothing to date).

93.    Donatucci, clothed with the power of his office with the City, continued to take advantage of the crushing blow Meghan suffered as a result of the death of her fiancé Michael by repeatedly pressuring her (with the assistance and cooperation of the Bank and minority member, unbeknownst to Meghan) to sell the Girard Avenue Property to him under duress and for far less than fair market value and attached to a number of contingencies, including relinquishing her role as Executrix to him and relinquishing the Estate's ownership in Michael's Commonly-Held Realty Interests, which Dontatucci and Mannion falsely claimed at one point had a "negative value."

94.    Initially, Donatucci and Mannion's tactics involved deliberately creating a false sense of urgency around alleged safety conditions of the Girard Avenue Property as a means of pressuring the Estate to sell to Donatucci. When Meghan did not meet Donatucci's demands, Donatucci leveraged this manufactured "urgency" against Meghan in attempt to rid Meghan of her interest in the Property by having WSFS attempt to (improperly) call the loan.

95.    Specifically, Donatucci, through his attorneys, alleged that the Property was in a "terribly dangerous and unsafe condition" and threatened that insurance on the Property would not be renewed. These allegations proved to be entirely false.

96.     Unbeknownst to Meghan, Donatucci was communicating with WSFS behind her back to set up the scenario for the Bank to call the loan and eliminate Meghan's interest in the Girard Avenue Property.

97.     Pursuant to Donatucci's instructions, on November 15, 2016, WSFS contacted Meghan to tell her the insurance was due to expire at the end of the month and that the Bank needed to see evidence that Meghan would renew, as well as that WSFS had "some real concerns" with the condition of the house pursuant to pictures they had allegedly seen, which Meghan later learned were taken by Donatucci and sent by him to the Bank. Meghan's counsel at the time, Richard Lipow, Esquire ("Lipow"), in reply, asked to see the pictures and confirmed that insurance would be obtained. In fact, there was never any lapse in the insurance coverage and the coverage was obtained by Meghan without any difficulty.

98.     Three days later, on November 18, 2016, WSFS threatened to call the loan on the pretense of Michael's passing under a due on death provision in the mortgage note. However, as noted above, in September 2016, Matter on behalf of WSFS had agreed of his own volition that the loan would not be in default as long as Meghan kept the mortgage and insurance payments current pending her disposition of the Property. This agreement by WSFS had been confirmed by phone and in an email from Matter to Meghan on September 20, 2016 and was reinforced in follow up communication. As noted above, in accordance with the agreement, Meghan made timely payments to WSFS each month and the loan, taxes, and insurance on the Property were kept current at all times.

99.     Despite Lipow's pushing back on WSFS's improper actions in light of WSFS's prior agreement with Meghan, WSFS maintained its new position in concert with Donatucci and demanded an inspection of the property. On November 25, 2016, WSFS's engineer, J. Jeffrey

Grant, MSCE, MBA, of GAC Associates, Inc., inspected the Girard Avenue Property and determined it to be structurally sound and secure. This determination by the engineer was a striking contrast to Donatucci's self-serving and baseless allegations that the Property was in a "terribly dangerous and unsafe condition" and that insurance on the Property would not be renewed.

100.    Meanwhile, Donatucci boldly continued to express interest in obtaining the Girard Avenue Property and on December 19, 2016, through Mannion, informed Meghan that "Tony Siu [(the minority partner)] is represented by Rich Mulcahey, who is ready to engage in discussions" about the Girard Avenue Property. At about this time, the Bank demanded a meeting with Meghan.

101.    On December 21, 2016, Meghan, who had been making efforts to sell the Property pursuant to her agreement with the Bank, met with a prospective buyer, Don Ventresca, at the Girard Avenue Property. When they met, Ventresca, who appeared to be unaware the property was owned by a "Donatucci," told Meghan that Donatucci "takes care of all my zoning and permits" for Ventresca's real estate development business. While Ventresca showed interest in the property, having made a low-value verbal offer, he abruptly stopped communicating with Meghan after she insisted she needed to be at the property for all showings and would not turn over the lockbox code to him, as he requested.

102.    On January 6, 2017, at the demand of WSFS, Meghan met with WSFS's counsel, Phillip Berger, and Amy Erickson, an assistant vice president of WSFS. Despite Meghan's and her mother's (who attended with Meghan) attempts to share with WSFS's representative and counsel what had occurred, including the Bank's improper actions, the meeting was used by WSFS to threaten Meghan with additional costs, foreclosure, and a judgment by confession against Meghan, and to demand that Meghan turn over the names of the prospective buyers with whom Meghan was in communication. This was concerning because the broker with whom Meghan was working

to sell the Property advised that prospective buyers were aware of Donatucci's interest in the Property. Meghan justifiably believed that Donatucci could retaliate against the prospective buyers if they purchased the Property, by adversely affecting its permitted use and by impacting zoning and permits on the buyer's other projects in the City, including through his son Donatucci Jr., also a real estate developer, who is currently an L&I Board member.

103.    After receiving an uninvited forbearance agreement sent shortly after the January 6, 2017 meeting, on January 25, 2017 Meghan's litigation counsel, Robert Feltoon, Esquire of Conrad O'Brien, PC ("Feltoon"), wrote to WSFS and pointed out the meddling by Donatucci in conjunction with the Bank's sudden change in tenor since agreeing to accept Meghan's payments in September 2016 and urged the bank to withdraw its November 18, 2017 email threatening to call the loan. WSFS never responded to Feltoon's January 25, 2017 letter, which is a sure sign that WSFS did not dispute the accuracy of the facts set forth in the letter. This was Feltoon's first introduction to WSFS and first public communication as counsel for Meghan in her capacity as Executrix and majority member of Penn Peak. WSFS then promptly informed Donatucci and/or Mannion of Feltoon's involvement in this matter, because Mannion proceeded the next day to contact Feltoon's law partner, who Mannion already knew, regarding Feltoon's involvement on behalf of Meghan, and to express Donatucci's continued interest in the Girard Avenue Property. The only way Mannion could have learned that Meghan had retained Feltoon was through WSFS.

104.    In the days that followed, Mannion repeatedly called Feltoon, and others at the law firm Conrad O'Brien, P.C., demanding to know the specific nature of the firm's involvement on behalf of Meghan. On February 10, 2017, Mannion expressed to Feltoon Donatucci's interest in the Girard Avenue Property and stated that Donatucci wanted access to the Property and planned to get into the building through Siu.

105.     On February 16, 2017, WSFS wrote to Feltoon that as long as the monthly payments are being made to WSFS when due, and as long as the insurance on the real property collateral remains current, and all real estate taxes remain paid and current, WSFS will allow Meghan to have until at least August 31, 2017 to sell the Girard Avenue Property and repay the loan in full.

106.     Donatucci's improper conduct in support of his attempts to gain control of the Girard Avenue Property continued to unfold over the ensuing months.

### E.     PATTERN OF THREATENING, HARASSING, AND IMPROPER CONDUCT IS STILL ONGOING

107.     Over the course of the Estate, Donatucci has resorted to bullying, intimidating, and threatening Meghan and her counsel in various ways, even causing Meghan to be concerned for her own safety as well as for the safety of her family at times. For example, Conrad O'Brien, P.C. was threatened by Donatucci, through a former FBI agent, Dave Gentile, who called a senior member of the law firm, stating that he was calling at the direction of Donatucci to deliver Donatucci's threat that the firm's reputation would be harmed if the firm continued to represent Meghan. This threat caused severe emotional stress to Meghan and her family, as it resonated with them after having received an earlier warning about Donatucci's dishonest dealings.

108.     Earlier, in January 2017, Donatucci made contact with Meghan's brother-in-law, when his staff at the Register of Wills' office, acting at the direction of Donatucci, followed him into a center city coffee shop and cornered him and his colleague until Donatucci arrived to deliver a message for and obtain information about Meghan regarding the Estate.

109.     Donatucci also attacked and threatened Meghan in an email from his counsel, Mannion, dated June 17, 2017 in which they blamed Meghan for Michael's death and stated that they would force her to "re-liv[e] these terrible events" if she did not accept their demands. Donatucci and Mannion had been depleting Plaintiffs' assets with claims and interference despite the probated

Will and Meghan's authority as Executrix, and they threatened at that time to further deplete Meghan's finances with a Will Contest if she did not agree to their demands (which, as discussed below, they later filed in keeping with their threat but have since withdrawn knowing that the Will Contest was a sham and filed for an improper purpose).

110.    Donatucci has made a number of personal attacks against Meghan including publicly. In addition to Mannion's June 17, 2017 email, on July 3, 2017, Donatucci was quoted in a Philadelphia newspaper, stating that Michael took his own life because "he was afraid to get married," and raised the highly publicized *Carter* case involving a young woman accused (and since the date of the article, convicted) of encouraging her boyfriend to commit suicide as though it were relevant to his son's death. These statements by Donatucci were intended to harass, intimidate, embarrass, and disparage Meghan.

111.    Foglietta has exhibited a similar pattern of harassment and threats against Meghan through emails, letters, and text and public Facebook messages, all of which were likewise intended to intimidate and disparage Meghan and many of which aligned with the timing of Donatucci's settlement demands and/or threats. Foglietta's behavior, like Donatucci's, is also in part retaliatory. Meghan's counsel turned over to federal authorities Foglietta's demand that Meghan pay her $40,000 (which Foglietta alleges Michael was holding in cash for her) that she did not disclose to her creditors, the Chapter 7 Bankruptcy Trustee, the United States Trustee, and the United States Bankruptcy Court in bankruptcy proceedings she commenced (with the help of Solicitor Golden and other counsel) in the United States Bankruptcy Court for the District of New Jersey. Donatucci and Solicitor Golden have repeatedly demanded that Meghan pay Foglietta out of funds belonging to Meghan despite their knowledge of the Estate's concern regarding this illegal activity.

112.    Despite having no interest in the Estate and inconsistent with the duties of a Register of Wills, Donatucci also created numerous other obstacles for Plaintiffs intended to interfere with their affairs. He has forced the Estate and Meghan to incur substantial legal fees and expenses to overcome the obstacles he has created, and he is using this as leverage in making demands of the Estate over Michael's real estate interests.

113.    For example, as part of this pattern of conduct against Plaintiffs, Donatucci withheld rents the Donatucci family real estate management company, Debro Investments, collected for Michael on the 20th Street Property which Michael owned outright and left to Meghan. Those rents, which are used to pay the mortgage on the property, were withheld from Meghan by Donatucci for more than six months, again despite Meghan's numerous requests as Executrix.

114.    With respect to Michael's Commonly-Held Realty Interests, Donatucci's refusal to share financial information (other than debts) forced the Estate to file federal and state fiduciary income tax returns without complete information such as K-1s. Donatucci refused to turn such information over despite Meghan's many requests.

115.    Despite refusing to pay to Plaintiffs any revenues they are owed from rents generated by the Commonly-Held Realty Interests, Donatucci has made demands that Meghan must immediately sign up for certain mortgage financing, including a line of credit from PNC Bank, an institution with which Donatucci has a close relationship through his friend Salvatore Patti, PNC's senior vice president of commercial banking. Meghan responded to an inquiry from PNC regarding the line of credit and requesting information in that regard by letter dated May 12, 2017, and her counsel at the time, Conrad O'Brien, P.C., also followed up with PNC by letter dated June 7, 2017. Having received no response from PNC and having heard nothing further from PNC, Donatucci, or Mannion regarding the line of credit in more than nine months, it was likely not a coincidence

on the day before a February 9, 2018 conference with the Orphans' Court that Mannion produced a demanding letter from PNC dated February 7, 2018, which Mannion unfairly used at the conference to suggest that Meghan was not meeting her fiduciary duties.

116.    Information Donatucci took from Plaintiffs and/or is withholding is needed to evaluate Michael's Commonly-Held Realty Interests, including for partitioning the properties and also to accurately complete tax returns. After having several meetings with Mannion in early 2017, in which Meghan's counsel shared in great detail the results of their investigative work and expert consultation regarding the properties (due to Donatucci's failure to provide the necessary financial information), Donatucci and Mannion demanded additional meetings, falsely promising to provide the requested information, but never doing so. The meetings were a deliberate tactic to wear down Plaintiffs and waste their financial resources. Despite subsequent Orders of the Orphans' Court of which he is the Clerk, to date Donatucci has produced only incomplete information including regarding debts, re-published information from the public record regarding tax assessments that Plaintiffs already had obtained from the public record, a few incomplete bank valuation reports, and reports only recently prepared by an accountant without including any source documents (such as the Quickbooks referred to above). As mentioned, Donatucci and Mannion do not want to provide this information to Meghan, as it would disprove Donatucci's unsubstantiated position that Michael's Commonly Held Realty Interests have a "negative value." Donatucci's "negative value" starkly contrasts with his son's, who was a Chartered Financial Analyst and intimately familiar with the finances related to the Commonly-Held Realty Interests, nearly $2 million net valuation in 2016.

### F.    DONATUCCI'S CONTINUED INTERFERENCE WITH AND EFFORTS TO TAKE THE GIRARD AVENUE PROPERTY

117.    On March 11, 2017, Meghan obtained a signed Agreement of Sale from a buyer for a $460,000 cash sale of the Girard Avenue Property ("Cash Sale"). That same day Meghan sent the Agreement of Sale to Siu.

118.    Meanwhile, Donatucci, who was aware of the Cash Sale buyer from Siu, pressed for access to the Property, alleging his low-ball offer was a result of structural issues with the Property, which was false, and that he allegedly needed to inspect it. Donatucci, who was already very familiar with the Property, having accessed it on at least several occasions following Michael's passing through the minority member, without Meghan's knowledge or consent, was well aware of the Property's condition, including that it had no structural issues.

119.    At the same time, on March 15, 2017, out of nowhere, without having objected to any of the terms of the Agreement of Sale or having objected to the price (as it would have only made it more expensive for Donatucci to outbid the Cash Sale buyer), Siu demanded that he be guaranteed to receive payment of $50,000 if he approved the Cash Sale, far more than he would have been entitled to under Penn Peak's Operating Agreement.

120.    On March 17, 2017, Siu's counsel, Richard Mulcahey, Esquire ("Mulcahey"), (of the law firm Schubert, Gallagher, Tyler and Mulcahey in Philadelphia, to which, on information and belief, Donatucci through his Register of Wills office and/or the Orphans' Court provides appointments) added a demand that a judgment lien in favor of Siu be recorded against the Girard Avenue Property and stated, in regard to paying the mortgage and the possibility of foreclosure, "I am sure you know that your client has more to lose than mine."

121.    On March 21, 2017, Mulcahey, who obtained the name of the Cash Sale buyer from the Agreement of Sale, reached out to the broker for the Cash Sale buyer without any notice to Meghan.

122.    Also, on March 21, 2017, in an effort to avoid greater loss through foreclosure, Meghan agreed to include language in the Agreement of Sale of the Cash Sale, confirming Siu would be paid $50,000 at the closing.

123.    In response, on that same day, Mulcahey added yet another demand, requiring without any basis, a *lis pendens,* despite the fact that Meghan had already promised Sui would receive $50,000 at the closing table before title passed to the Cash Sale buyer and had agreed to include that demand in the Agreement of Sale. Meghan, who had grown increasingly skeptical of Siu's motives by this point and had other concerns about a *lis pendens*, rejected the demand for a *lis pendens,* and on March 22, 2017, Mulcahey, on behalf of Brimfield/Siu, flatly refused to consent to the Cash Sale. In concert with Donatucci, Siu and Brimfield continued to withhold consent to the Cash Sale, and, as a result, the Cash Sale fell through.

124.    On April 6, 2017, upon further attempts by Donatucci to force his demands upon Plaintiffs, Feltoon on behalf of Meghan reiterated the request to Donatucci's counsel, Mannion, for documents with respect to the properties, including for tax return purposes, and other assets of Plaintiffs including but not limited Meghan's belongings in the apartment she shared with Michael. Donatucci failed to comply, and continued to make unreasonable demands while withholding the necessary information needed to evaluate such demands.

125.    On April 14, 2017, out of nowhere, WSFS demanded that Meghan disclose her efforts to sell the Girard Avenue Property. WSFS's letter came within several days of Meghan receiving letters from Donatucci's Solicitor Charles Golden, purportedly on behalf of Foglietta, and from

PNC Bank, also closely connected to Donatucci, as mentioned above. All efforts were meant to pressure Meghan to sell Plaintiffs' realty interests (not just the Girard Avenue Property) to Donatucci quickly and for a cheap price.

126.    Golden's letter demanded Meghan "promptly liquidate the real estate interests," i.e., accept Donatucci's demands for the Girard Avenue Property and Michael's Commonly-Held Realty Interests (which would effectively cheat his alleged client, Foglietta, out of her interest), while PNC Bank requested information from Meghan as if an obligor on a certain entity's line of credit, despite failing to respond to Meghan's earlier request for debt instruments relative to that line of credit. Meghan mentioned in her reply to PNC Bank that she hoped PNC's letter was not due to third party interference (i.e., Donatucci); as mentioned, no reply from PNC to Meghan's response was received.

127.    On April 21, 2017, Meghan contacted the Cash Sale buyer to see if it could increase its offer for the Girard Avenue Property, in an attempt to salvage the deal and get Brimfield/Siu on board. Talks continued thereafter until it became apparent that the buyer's position was not changing because, in the buyer's view, Brimfield/Siu was being unreasonable.

128.    On June 30, 2017, Meghan, as Executrix and as successor of Michael's majority (77.5%) membership interest in Penn Peak, in an effort to avoid further loss through foreclosure of the Girard Avenue Property, filed a Complaint against Brimfield and Siu in the Court of Common Pleas of Chester County under Docket No. 17-06631-MJ (the "Penn Peak Dissolution Case"). On July 11, 2017, Meghan filed a Petition seeking judicial dissolution of Penn Peak in the Penn Peak Dissolution Case and an evidentiary hearing on that Petition was scheduled for August 18, 2017.

129.    On August 23, 2017, following the evidentiary hearing, the Court of Common Pleas of Chester County entered an Order granting Meghan's Petition seeking judicial dissolution of Penn

Peak and authorizing her alone (without the minority member's consent) to sell Penn Peak's sole

real estate asset, the Girard Avenue Property, and pay off WSFS and other creditors of Penn Peak.

### G.  DONATUCCI'S RETALIATORY AND MALICIOUS WILL CONTEST AND REMOVAL PETITION

130.    On July 19, 2017, angered by Plaintiffs' institution of the Penn Peak Dissolution Case and

their refusal to accept Donatucci's demands to sell their realty interests to him for a low price and

that Meghan relinquish her role as Executrix to him, Donatucci, through his life-long friend

Defendant Frank DeSimone, Esquire, a Philadelphia criminal defense attorney, retaliated against

Meghan by filing a petition to remove her as Executrix in the name of Donatucci's ex-wife,

Foglietta (the "Removal Petition"). Donatucci could not file the Removal Petition in his on name

because he is not a beneficiary under Michael's Will, and for that reason was without standing to

raise any of the issues in the Removal Petition. The Removal Petition claimed, *inter alia*, that

Meghan was not carrying out her fiduciary duties in regard to Penn Peak and the Girard Avenue

Property. Nothing could have been farther from the truth, as was shown at the August 18, 2017

hearing in the Penn Peak Dissolution Case.

131.    On August 4, 2017, Donatucci through Mannion also filed a Will Contest in his Orphans'

Court. This Will Contest was an appeal by Donatucci from his own decision as a judicial officer

admitting Michael's Will to probate a year prior. Under Pennsylvania law, the admission of a Will

to probate by the Register of Wills is a judicial decision. *See, e.g., Mangold v. Neuman*, 371 Pa.

496, 498, 91 A.2d 904, 905 (1952). Four days later, Donatucci's personal friend and decades-long

colleague, Administrative Judge of the Orphans' Court Division, Matthew Carrafiello, ordered the

issuance of a citation to Meghan, directing her to show cause why Donatucci's Will Contest should

not be sustained. Judge Carrafiello also issued a similar citation to Meghan with respect to the

Removal Petition.

132.    Donatucci's approach to the filings was twofold – he not only sought to become a beneficiary of Michael's Estate, attempting to take what Michael left his fiancée and his mother through a Will Contest, but also sought to gain control of Plaintiffs' assets and the Estate, which was the purpose of his Removal Petition. If the Removal Petition were to be granted and Meghan were to be removed as Executrix, Donatucci would benefit personally by becoming executor of the Estate under a provision of Michael's Will naming Donatucci as the contingent executor, and he would thereby take control of Plaintiffs' assets and the Estate, , to the detriment of Plaintiffs.

133.    Donatucci attempted to serve the Will Contest and Removal Petition on Sunday, August 13, 2017. That day, several business cards with a threatening message from a Constable, Joseph C. Valerio, were left on the front and back doors of Meghan's parents' residence in Lafayette Hill, as well as on the cars on the driveway of the property, reading:

> "A warrant for your arrest may be issued which may lead to your incarceration. Call my office immediately for information on how to resolve this matter."

This was alarming to Meghan and her family who were confused by such a notice.

134.    On Monday, August 14, 2017, Meghan's counsel at that time, Feltoon, called Mannion and inquired whether he and Donatucci were attempting to serve Meghan and advised that the Constable's business cards were left at Meghan's parents' home the day before. Mannion acknowledged that service of the Will Contest (and Removal Petition, as was later learned) was attempted on that Sunday. Feltoon and Mannion discussed resuming discussions regarding Donatucci's demands, but the ensuing actions ran counter to that discussion.

135.    On the evening of August 22, 2017, Donatucci sent several Constables (at least two of whom were armed) to Meghan's parents' residence in Lafayette Hill as if they were there to make an arrest, yelling and banging loudly on the front and back doors as well as windows at the kitchen at the rear of the home. Meghan's mother who was sitting in the kitchen felt very threatened by

the Constables. The Constables inquired as to whether Meghan was "at the gym," insisted that they wait for her to arrive home to serve her, and refused to leave the papers with Meghan's mother, or in the alternative to serve Meghan's lawyers at Conrad O'Brien, P.C., whom Meghan's mother called upon the Constables' arrival to her home. The Constables insisted that they had to serve Meghan. Because of the Constables' actions, Police arrived at the scene and required the three Constables, all of whom were from outside the area, to leave the premises. At that point, one of the Constables handed Meghan's mother the Will Contest and the Removal Petition and demanded that she sign for them. This scene could only have been intended as an intimidation tactic by Donatucci, Mannion, and DeSimone, to frighten, pressure and embarrass Meghan and her family in front of neighbors and friends in their quiet neighborhood.

136.    Meghan later became aware that Donatucci also sent a process server <u>undercover</u> to Meghan's best friend's wedding on Friday evening, August 18, 2017, in an attempt to serve Meghan with the Will Contest and Removal Petition *at the wedding.*

137.    The process server came to the wedding dressed to blend in with the guests in order to gain access, and he lurked around the various wedding locations, including Old St. Mary's Church in Philadelphia where the ceremony was held, the Loews Hotel where wedding guests were staying, and the Crystal Team Room in Philadelphia where the reception took place. Earlier that same day, August 18, 2017, Meghan had testified in the Penn Peak Dissolution Case. Donatucci was fully aware of those proceedings, and it became evident when opposing counsel began questioning Meghan, including regarding Donatucci's Orphans' Court filings that had not yet been served upon Meghan.

138.    Apparently unhappy with the proceedings and Meghan's testimony on August 18, 2017, Donatucci set out to retaliate and deliberately upset Meghan by attempting to serve her with his

Will Contest and Removal Petition at her friend's wedding, which was less than a year after Michael and Meghan's planned wedding date of September 24, 2016. Donatucci's attempt to hurt Meghan and ruin the evening at her friend's wedding failed, but he unfairly disrupted and distracted the bride, the bride's family, and Meghan's friends who had noticed the uninvited process server and out of concern for Meghan shielded her from his continued pursuit of her that evening, unbeknownst to Meghan.

139.    Donatucci's conduct in directing the above action shows just how far he will go to advance his scheme against Plaintiffs.

140.    Donatucci's Will Contest and Removal Petition were a sham intended to harass, intimidate and threaten Meghan in order to advance Donatucci's scheme to unfairly leverage and extort a deal with Plaintiffs.

141.    In the Will Contest, Donatucci claimed that Michael "had a long history of anxiety and depression" and, for that reason, he lacked testamentary capacity. Assuming, *arguendo*, Donatucci's claim that Michael had such "history" was true, these facts were known to Donatucci when he admitted Michael's Will to probate and granted Letters Testamentary to Meghan. Donatucci was also aware of and in possession of the alleged prior will at the time of probate.

142.    Given the stringent process followed by the Register in probating wills, the fact that Donatucci is responsible for "hear[ing] testimony with regard to any challenge and makes a decision accepting or rejecting the [Will]" per his website, and this particular set of circumstances involving his son, it is highly unlikely that Donatucci, who has been serving in the same position for close to 40 years, erred in his judicial decision to admit *his son's* Will to probate.

143.    In fact, Donatucci consulted Mannion and Eugene Gillin, Esquire of the law firm Harkins and Harkins prior to probating Michael's Will, and, as noted, was fully aware of the alleged prior

will. Donatucci boasted to friends and family on the days following Michael's death about his son's impressive presentation that he made on the day he passed to the Philadelphia Pension Fund's Board as Chief Investment Officer. Also, on July 18, 2016, WHYY reported that Mayor Kenney stated:

> [Michael] [was] a good kid, very smart, actually [only weeks earlier] he saved us millions of dollars by exiting investments before Brexit hit, he had the foresight and understanding.  He saw Brexit was coming and he got our money out of areas that were at risk [. . .]

144.    It is undeniable that Michael had testamentary capacity and that the Will Contest was a sham, filed by Donatucci only for leverage and to extort Meghan to accept his demands. Michael's probated Will indicates he had intelligent knowledge regarding the natural objects of his bounty, the property he possessed, and what he desired to be done with it.

145.    As discussed below, faced with being held in contempt of an Orphans' Court's Order dated June 12, 2018 compelling him to cooperate with Estate administration and to turn over property of the Estate and Meghan that he wrongfully took for himself and/or removed from Meghan and Michael's apartment (after already failing to comply during a stay which he requested and obtained to allow him to produce such information and things), and faced with sanctions regarding matters raised in conjunction with Plaintiffs' petition filed on January 21, 2018 (amended April 17, 2018) calling to the Orphans' Court's attention Donatucci's various bad faith conduct and his threats against Meghan and her counsel, including for filing a falsified record with the Court (redacted without disclosure), in a desperate attempt to avoid a further order of the Orphans' Court against him, Donatucci withdrew his baseless Will Contest on November 8, 2018. As discussed below, a further Order of the Orphans' Court was entered against Donatucci on December 13, 2018, with which Donatucci still has not fully complied and is in contempt. Contrary to what Donatucci may

believe, withdrawing his Will Contest does not rid him of his obligations to the Estate, nor does it invalidate or diminish the years' worth of undue hardship he has inflicted upon the Estate.

146.    Donatucci's role in the Removal Petition is apparent from the Petition's contents (Donatucci is the source of many of its factual allegations) and from Donatucci's arranging for his friend DeSimone to file it in his ex-wife's name. The Removal Petition was intended to unfairly pressure Meghan to give up her interests in the Estate, including, but not limited to, in Penn Peak and the Girard Avenue Property.

147.    For example, the following allegations in the Removal Petition have nothing to do with Foglietta or her interests in Michael's Estate, and their source could only be Donatucci:

- The Estate failed to make payments on the mortgage on the Girard Avenue Property.

- Donatucci visited the Girard Avenue Property.

- The Girard Avenue Property was dangerous and unsecured.

- Meghan has failed to make payments on the Girard Avenue Property.

- Meghan's actions and inactions with respect to the Girard Avenue Property are jeopardizing the Estate and exposing its assets to liability.

Except for the allegation that Donatucci visited the Girard Avenue Property (which was done behind Meghan's back), the rest of the allegations were false, and this was demonstrated at the August 18, 2017 hearing in the Penn Peak Dissolution Case.

148.    In fact, drafts of the Removal Petition recently uncovered in the litigation pending in Chester County show that it was prepared by Donatucci and Mannion and sent to Solicitor Golden and DeSimone to be filed. A draft shows that Donatucci had set out to attack Meghan's mental capacity, just as he purported to do with respect to Michael in the Will Contest he has since withdrawn. Not only has Meghan executed all of her fiduciary duties to the highest level, but

Donatucci has had no contact with her nor any firsthand (or secondhand for that matter) knowledge of her mental or emotional capacity to challenge her service as Executrix.

149.    The Removal Petition was filed by DeSimone in Foglietta's name on July 19, 2017. The Removal Petition is a fraud on the same Orphans' Court for which Donatucci serves as its Clerk.

150.    Indeed, Foglietta, who has no interest in the Girard Avenue Property (100% of Michael's interest in the Property was left to Meghan), which is one of primary focuses of the Removal Petition, admitted in pleadings filed in the Orphans' Court that she has no firsthand knowledge of the facts alleged in the Removal Petition in that regard.

151.    The Removal Petition also alleges that Michael's Commonly-Held Realty Interests are "illiquid, non-marketable private interests, which are not readily saleable," and therefore should be sold to Donatucci for well under the properties' open market values, which is a clear indication of Donatucci's involvement. Foglietta could have no personal reason to make such assertions unless she was being coerced or induced by Donatucci.

152.    Donatucci's friend, DeSimone, and Golden, Donatucci's Solicitor as Register of Wills, are helping him do his bidding, using Foglietta's name in the Removal Petition to make false arguments that Meghan is breaching her fiduciary duty as Executrix of Michael's Estate by not agreeing to Donatucci's demands. As a potential seller of her share of the co-owned real estate, it is certainly not in Foglietta's personal interest to embrace the position that the property interests she shares with Meghan are "illiquid, non-marketable private interests, which are not readily salable." The only person who benefits from that view is the majority owner of the Commonly-Held Realty – Donatucci – who has repeatedly tried to acquire the Estate's interest for far under the fair market value, and certainly under the value the properties would generate in a court-ordered partition proceeding. In fact, Donatucci's demands, if accepted by Meghan in her capacity as

Executrix, would actually cheat Foglietta out of her rightful inheritance, the value of her interest in the Commonly-Held Realty Interests left to her in Michael's Will.

153.    Foglietta knows this, as she contacted Plaintiffs last summer, in a text to Meghan's father, stating that Donatucci "is my ex and not looking after my interests. I know that." This admission supports that the Removal Petition is a fraud on the Orphans' Court, being perpetrated by Donatucci, Mannion, Solicitor Golden, DeSimone, and Foglietta.

154.    The above shows that Donatucci is using the Removal Petition as part of a scheme to have Meghan removed as Executrix based on false accusations, likely inducing Foglietta to cooperate with him against Meghan pursuant to an undisclosed deal. This is further supported by the fact that Foglietta appears to have reached an agreement with Donatucci for a monetary sum in exchange for (at least part of) her 25% interest in Michael's Commonly-Held Realty Interests. According to Foglietta's admissions in the Orphans' Court proceedings, part of that agreement includes that Donatucci is paying for her to live in one of the co-owned properties (1402 E. Moyamensing Avenue, Unit 3, in Philadelphia, among the hottest real estate in the City) in which the Estate has an interest but is not receiving its share of rents. This sort of deal between Donatucci and Foglietta would not appear to be improper except for the fact that it is champertous in view of the Removal Petition. Foglietta's continuing with the Removal Petition (even though possibly forced by Donatucci against her will) in light of her expressed willingness to accept Donatucci's various demands (and her already having accepted at least part of that deal), is bad faith, collusive, and fraudulent, if not illegal. Foglietta's complicitness in Donatucci's baseless Will Contest, failing to object or respond to the Will Contest despite the fact that doing so would be in her best interest, also supports Donatucci's and Foglietta's champertous conduct. As noted above, Foglietta through Solicitor Golden demanded earlier, long before the Removal Petition was filed on July 19, 2017,

that Meghan accept Donatucci's demands, which shows she had a deal then that she was willing to take. Donatucci's use of her name on the Removal Petition is an outrageous and malicious act. This conduct is indicative of his extorting Foglietta, as well as Meghan. Donatucci has disregarded his official duties, undermining both the authority of his position and his ability to carry out those duties.

155.    As this conduct is being carried out within the plain view of the state court, there can be no doubt that the Court is turning a blind eye and is complicit in Donatucci's outrageously improper conduct.

156.    As shown herein, there is a pattern of Donatucci abusing his power and retaliating when his demands are not met. It is clear that Donatucci made no error in probating Michael's Will, but rather that he made a conscious and deliberate decision to probate the Will on August 11, 2016 with the forethought that he would be able to coerce Meghan to meet his demands. His actions show that he never intended to see the Will Contest and Removal Petition through, and that he filed both for an improper goal of using them as leverage in continuing to try to force Meghan to accept his demands (while taking steps to avoid publicity on his cases), because if she didn't, he would continue to use his power to wear her down financially and attack her without any regard for the law, the duties of his office, and the harm he is causing to her.

157.    Donatucci has taken various steps to avoid negative public attention on his improper conduct, which has been raised by Plaintiffs in response to Donatucci's Will Contest and Removal Petition.

- He obtained two stays of the Orphans' Court proceedings under the guise of wanting to a) comply with Plaintiffs' requests for information and things, as he is required by law to do, and resolve with Meghan (as he claimed in September 2017

after Plaintiffs filed a response to the Removal Petition) and b) turn over to Plaintiffs the information and things they requested (as he claimed in February 2018 after Plaintiffs filed a petition to compel and for sanctions that reported to the court his threats against Plaintiffs and their counsel).

- He has to date failed to comply not only with the Executrix's requests for information, documents, and things but also with Orders of the state courts. He is withholding information, and has even admitted to destroying information, that he is required to produce because he does not want the information discovered and/or published on the record. This is another key reason why Donatucci withdrew his Will Contest on November 8, 2018.

- Significantly, public access to the Philadelphia Orphans' Court docket online, which docket Donatucci controls in his capacity as Register of Wills and Orphans' Court Clerk, has been off line and unavailable for a significant period of time.

## H.    DONATUCCI'S MEDDLING INVOLVING THE ESTATE'S <u>INHERITANCE RETURN</u>

158.    Donatucci's refusal to turn over records from Meghan and Michael's apartment as well as his refusal to provide other records bearing on Michael's Commonly-Held Realty Interests, which were needed by Meghan to prepare the Estate's inheritance return, delayed preparation of the return. Meghan also reached out to the IRS for information and was informed that Donatucci had failed to file tax returns regarding certain of the Commonly-Held Realty Interests.

159.    Upon Meghan's filing the Inheritance return, on information and belief, Donatucci used his power as Register to obtain a copy of the return. On or about April 13, 2017, Mannion obtained a copy of the return from Donatucci, which he later appended to the Removal Petition, filed July 19, 2017, without proper redaction in the Orphans' Court. As of July 19, 2017, the inheritance

return was still pending review by the Pennsylvania Department of Revenue and was not publicly available.

160.    Despite the fact that the inheritance return Meghan *timely* filed was prepared and signed by a Certified Public Accountant with the assistance of tax counsel and consistent with the Department of Revenue's REV-1500 instructions, on information and belief, Donatucci and his counsel, and Foglietta accused and are continuing to accuse Meghan of committing perjury by reporting false information in the inheritance return. On information and belief, these statements have been made by such Defendants to the Department of Revenue and to others.

161.    Donatucci and Mannion and/or his law firm Mannion Prior also used and are continuing to use the Removal Petition to make similar and other false and defamatory statements about Meghan. They alleged in the Removal Petition that the inheritance return was filed late (their apparent objective in failing to turn over records), which was false. As noted, while the Removal Petition was falsely filed in Donatucci's ex-wife's name (as noted above, Donatucci had no standing to raise any of the issues in the Removal Petition since he is not a beneficiary under Michael's Will), Donatucci and Mannion and/or his law firm Mannion Prior are the source of the statements in that Petition.

162.    In addition to taking property of Meghan and the Estate from the apartment shared by Meghan and Michael, and withholding other things and information from Meghan despite her numerous requests and Orders of the state courts, Donatucci has failed to reimburse the Estate for inheritance tax on a joint right of survivorship account.

163.    Further, Donatucci and persons acting at his direction, including members of his office of the Register of Wills and Foglietta, meddled and improperly communicated with the Pennsylvania

Department of Revenue in regard to the inheritance tax return while it was pending and under review by that Department.

164.    The Register of Wills should have no interaction with the Department of Revenue in regard to the inheritance return, as the return was filed timely and the inheritance tax owed was paid in full. According to the Register of Wills website, the Register serves "**only** as an agent for the filing of the Inheritance Tax Return and the payment of the Inheritance Tax." Emphasis Added.

165.    Based on information and belief, as a result of Donatucci's meddling and interference with the Department of Revenue in regard to the inheritance return, the Estate was assessed additional tax, penalties and interest.

166.    As a result, in April 2018, Plaintiffs were forced to incur the expense of filing a request for an administrative correction and an appeal of the additional tax, penalties and interest assessed against the Estate, which, per a decision of Susan Hower, Tax Appeals Reviewer, issued on May 10, 2018, was fully successful but at considerable unnecessary expense to Plaintiffs.

## I.    DONATUCCI'S CONTINUING MEDDLING IN THE ESTATE LEADS TO AN INJUNCTION BEING ENTERED AGAINST HIM

167.    After the Removal Petition and Will Contest were filed, in view of Donatucci's ongoing scheme, and WSFS's threat to call the loan, foreclose on the Girard Avenue Property, and confess judgment against Meghan despite the Chester County Court's August 23, 2017 Order giving Meghan sole authority to sell the Property and pay off the mortgage, Plaintiffs were forced to initiate action against Donatucci and other parties (including WSFS and Brimfield/Siu) in the case entitled *Estate of Michael P. Donatucci et al. v. Wilmington Savings Fund Society, FSB et al.* in the Court of Common Pleas of Chester County, Docket No. 17-08494-TT (the "Chester County Action").

168.    On August 31, 2017, an Injunction Order was entered against all the defendants in the Chester County Action. The Injunction Order restrained Donatucci, WSFS, and Brimfield/Siu from, *inter alia*, further interference with the Girard Avenue Property (in which Donatucci had no interest but was trying to obtain for himself through the above scheme) and prohibited WSFS from calling or accelerating the loan or exercising any rights under its loan documents against Plaintiffs.

169.    Despite Plaintiffs' reporting Donatucci's conduct in pleadings and testimony before the Chester County Court and the entry of the Injunction, Donatucci did not relent. He verbally taunted Meghan and her mother, including berating them with "the truth will come out" and calling them "horrible people," *inside* a Chester County courtroom, while the Judge and counsel were in the court's chambers for a conference prior to a hearing on September 18, 2017 in the Chester County Action.

170.    At that September 18, 2017 hearing in the Chester County Action, several employees of the Register of Wills office accompanied Donatucci (including DiGregorio and Catalano), despite the fact that Donatucci was joined in that action only in his individual capacity.

171.    Following the hearing, over objections of Donatucci, WSFS, and Brimfield/Siu, the Chester County Court entered further Orders reinforcing and keeping in place the Injunction pending the sale of the Girard Avenue Property, and also compelling such defendants' cooperation with discovery, which, in concert and consistent with their scheme, they have not met.

172.    In the Chester County Action, Donatucci, WSFS, and Brimfield/Siu have repeatedly abused process by filing baseless pleadings and engaging in dilatory conduct intended to cause Plaintiffs to incur unnecessary litigation expenses and enhance false claims for attorneys' fees and other damages. These Defendants have also deliberately and in concert with each other withheld, hidden, altered, and/or destroyed documents and information that are discoverable, relevant, and

required to be turned over to Plaintiffs, in violation of the rules of court and the Chester County Court's clear and direct Orders.

173.    The pattern and nature of Donatucci's conduct in the foregoing proceedings in the Orphans' Court and Chester County Action demonstrates his improper discriminatory purpose and continuous departure from common practice of a reasonable person in the position of Register of Wills and Clerk of the Orphans' Court. His recurring unlawful conduct exhibits no legitimate exercise of discretion or decision-making. This conduct has had the purpose of, and it continues to be intended to wear down Meghan and hinder or prevent her from pursuing a proper partitioning of Michael's Commonly-Held Realty Interests in the Philadelphia courts in which Donatucci has influence and control, and coerce unfairly Plaintiffs to accept his demands. He wields his power with impunity in Philadelphia, because the City and its court system are complicit and reward Donatucci's politics by turning a blind eye to his improper conduct. The examples below are among many already noted:

- Threatening Plaintiffs and their counsel and interfering with their legal representation.

- Harassing, retaliating, and conspiring with others against Plaintiffs for rejecting his demands.

- Harassing and retaliating against Plaintiffs for exercising their First Amendment rights to free speech and access to the courts, and for Plaintiffs' filing the Penn Peak Dissolution Case on June 30, 2017 (regarding a property in which Donatucci had no legal or equitable interest) in violation of her Fifth and Fourteenth Amendment rights to due process and equal protection. Those rights have also been violated by Donatucci's retaliatory filings of the Removal Petition in his ex-wife's name and

the Will Contest appealing his judicial decision as Register to probate Michael's Will as being valid and enforceable.

- Harassing and retaliating against Plaintiffs for exercising their First Amendment rights to free speech and access to the courts in testifying in the Penn Peak Dissolution Case on August 18, 2017.

- The taunting and harassing of Meghan in the courtroom in the Chester County Action on September 18, 2017 in retaliation for pursuing her legal rights in the courts, in violation of her rights under the First, Fifth and Fourteenth Amendments.

- Entering the apartment Meghan and Michael shared without permission and taking Meghan's and Michael's belongings. Using city employees (including DiGregorio, Catalano and her husband, and Ruth) to remove Meghan's and Michael's belongings, including files and records regarding the Estate, and regarding real estate in which he, Donatucci Jr., and Michael or his Estate have interests (including city employees DiGregorio and Samantha Valtri), by which Donatucci took Plaintiffs' property without right, public purpose, or just compensation, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

- Taking Michael's Will and keeping it from Meghan (until he was caught when Michael's Boomerang email arrived three days after his death).

- Disdain for clear and direct Court Orders compelling his cooperation and requiring him to turn over property, records and things that he took from Plaintiffs (which, again, also violates the Fifth and Fourteenth Amendments).

- Lying to the Court about changing passwords to Michael's email accounts and entering Michael and Meghan's apartment and taking their belongings.

46

- Destroying documents as revealed in the Chester County litigation.

- Falsifying phone records concerning Michael's cell phone filed in the court record.

174.    This conduct by Donatucci undermines the authority of his office with the City and his ability to carry out his duties as Register of Wills and Clerk of the Orphans' Court.

175.    The City's court system likewise undermines the confidence of those who come before it when officials such as Donatucci bear influence for their own personal gain.

176.    While Donatucci's actions in this Estate continue to depart from the Register's common practice, the pattern of his using his office to intentionally discriminate for his own gain is not limited to this case. For example:

- *Sisinia Pro v. Ronald R. Donatucci, Register of Wills*, 81 F.3d 1283 (3rd Cir. 1996), a case that was filed in this Court (Civ. A. No. 94-6001, before the Honorable Stewart Dalzell) in which Donatucci was the subject of claims of violating civil rights for retaliating against a witness for his former wife during their divorce.

- *Lask v. Ronald R. Donatucci, Register of Wills, et al.*, also filed in this Court (Civ. A. 06-3066, before the late Honorable Norma L. Shapiro), in which it was claimed that Donatucci, represented by DeSimone, was refusing to grant hearings or approve the appointment of a decedent's daughter and intestate heir (who was also an attorney) to serve as administrator of her late mother's estate in favor of a political ally.

177.    In Philadelphia City Hall and throughout Pennsylvania's branches of government, matters involving Donatucci evoke bias in his favor.

178.    The institutional integrity of the judicial process is being corrupted by Donatucci's influence in regard to this Estate.

179.    It is no secret that for decades Donatucci has openly used his official power and influence to benefit himself and persons selected by him. In his own words, "Mr. Donatucci is 'convinced patronage works'." Claudia Vargas, 'It's patronage. It works:' Donatucci seeks 10th term, Philadelphia Inquirer (Oct. 26, 2015), http://www.philly.com/philly/news/breaking/20151026 __It_s_patronage__It_works___Donatucci_seeks_10th_term.html. As far back as 1994, the Philadelphia Inquirer began reporting about Donatucci's "Private Empire" made during his time as a public official, and his often blurring the lines between that Empire and his position as Register of Wills, and also characterizing him as "the Prince of Patronage." In 2011 the Inquirer Editorial Board published an article titled "Register of Wills Uses Patronage to Keep Job."

180.    Donatucci has frequent personal and professional interactions with the judges of the Courts, and it is well known that he has provided significant support to many of judges' political campaigns. Through his official positions, Donatucci is in a position to have *ex parte* conversations with the judges about substantive and procedural matters.

181.    More recently, in connection with this case, consistent with his threatening harm to Plaintiffs' counsel's reputation if they (Feltoon and his firm Conrad O'Brien, P.C.) continued to represent Meghan in regard to the Estate and in line with his scheme to wear down Meghan financially and force her to accept his demands, on information and belief Donatucci is using his office, power, and influence in the courts to retaliate against and harm Meghan's father, both in his reputation and financially, as shown below.

### J.    DONATUCCI'S THREATENING MEGHAN'S COUNSEL HAS CAUSED HER AND THE ESTATE SIGNIFICANT HARM AND EXPENSE

182.    Feltoon represented the Estate in various litigation including in a slip and fall case regarding the Estate's property at 1227 S. 20th Street, the Penn Peak Dissolution Case, the Will Contest and Removal Petition matters initiated by Donatucci, and the Chester County Litigation

in which the Injunction was entered against Donatucci and certain other parties noted above. Feltoon abruptly withdrew from all of these matters in early 2018, due to Donatucci's and Mannion's interference with Feltoon's representation of Meghan.

183.    As noted above, Donatucci threatened that Feltoon's law firm's reputation would be harmed if the firm continued to represent Meghan. Mannion likewise interfered with Meghan's representation by hiring Feltoon's firm to represent him in another matter (without disclosure), shortly after the threat was made by Donatucci. The interference with the Estate's and the Executrix's counsel (including Donatucci's threat to their counsel) compromised the Estate/Executrix's representation in this matter and resulted in significant expense to the Estate and the Executrix.

### K.    DONATUCCI'S INTERFERENCE HAS EXTENDED BEYOND MICHAEL'S ESTATE TO MATTERS EVEN TANGENTIALLY INVOLVING THE EXECUTRIX, INCLUDING HER FATHER'S LAW PRACTICE IN STATE COURT

184.    Feltoon had also been representing Meghan's father (the undersigned local counsel for Plaintiffs) in his capacity as Administrator D.B.N. of the *Estate of John McGarry* in proceedings pending in the Orphans' Court in Philadelphia and in two appeals before the Superior Court of Pennsylvania prior to his representing Plaintiffs. The *McGarry Estate* has been pending since 2009, and Meghan's father was appointed Administrator DBN in 2011 when the prior administrator was replaced for not doing his job by the Honorable Joseph D. O'Keefe, then the Administrative Judge of the Orphans' Court.

185.    As a result of the foregoing conduct by Donatucci and his counsel in Michael's Estate, last spring Feltoon petitioned the Court for permission to withdraw from the *McGarry Estate* (what should have been an entirely unrelated matter) despite having already been paid with funds

advanced by the Meghan's father, which should have been reimbursed to him from funds held on account (but which were frozen by the Court) in the *McGarry Estate*.

186.     In March 2018, Judge Carrafiello, who is the current Administrative Judge of the Orphans' Court and who issued the citations to Meghan in Donatucci's Will Contest and Removal Petition, recused himself and the entire Orphans' Court bench from hearing matters involving the Meghan's father *sua sponte*, including in the *McGarry Estate*, apparently in view of the Will Contest and Removal Petition initiated by Donatucci against Meghan. *See* letter from President Judge Idee C. Fox dated December 14, 2018, attached hereto as **Exhibit "A"**.

187.     Unbeknownst to Meghan's father at the time, but revealed to him in President Judge Fox's December 14, 2018 letter, Judge Carrafiello apparently had "also notified the then President Judge [Sheila Woods-Skipper] that a request to appoint an out of county judge should be made to the Supreme Court" in the *McGarry Estate*.

188.     Judge Carrafiello's notification to President Judge Woods-Skipper that a request to appoint an out-of-county judge should be made to the Supreme Court was ignored and no such request was made and the *McGarry Estate* matter was passed on to the Civil Trial Division.

189.     Subsequently, Donatucci and his counsel in the Chester County Litigation, Chester County Republican Party Chairman Valentino F. DiGiorgio, III, Esquire and Samantha Kats, Esquire of the Stradley Ronon law firm (which also represents the former administrator in the *McGarry Estate*, Dylan McGarry, a special assistant to the Lieutenant Governor of Pennsylvania), attempted to use the proceedings in the *McGarry Estate* to gain a further unfair advantage against Meghan by attempting to obtain privileged information bearing on Michael's Estate that Donatucci and his counsel apparently anticipated would be disclosed at a June 11, 2018 hearing that was scheduled on Feltoon's petition to withdraw from the *McGarry Estate* after Donatucci's interference.

190.    Fully aware that the proceedings in regard to Feltoon's petition to withdraw from the *McGarry Estate* were <u>directly intertwined</u> with Michael's Estate (from which Feltoon had withdrawn without permission of the Court in January 2018) and in spite of Judge Carrafiello's recommendation an out-of-county judge be assigned, the Court assigned a Civil Trial Division Judge, the Honorable M. Teresa Sarmina, to preside over the proceedings in the *McGarry Estate.*

191.    In those proceedings on June 11, 2018 before Judge Sarmina, Feltoon had indicated he would introduce evidence of the details of the Orphans' Court proceedings in both the *McGarry Estate* and Michael's Estate.

192.    Over Meghan's father's objection based on attorney-client and work product privileges, Judge Sarmina ruled that Feltoon was permitted to introduce <u>privileged information</u> from both the *McGarry Estate* and Michael's Estate in support of his petition to withdraw in the *McGarry Estate*. This presented a very serious and highly unfair dilemma for Meghan's father, which he expressed to Judge Sarmina, as the disclosure of privileged information would prejudice both the *McGarry Estate* and Michael's Estate.

193.    Donatucci's other counsel, Mannion Prior, also meddled in the June 11, 2018 hearing. In fact, as Feltoon was about to discuss and introduce records covered by the attorney-client and work product privileges (over Meghan's father's objections), including in regard to Michael's Estate, the following occurred:

> MR. KLEIN[ ]: . . . There is a gentleman here and he wouldn't identify himself to me.
>
> THE COURT: Is he here for me? Sir, who are you?
>
> THE WITNESS: I'm sorry. Just an (sic) spectator, Your Honor.
>
> THE COURT: Who are you?

THE WITNESS: I'm answering the question. I'm for an entity that may be interested in this proceeding, Your Honor.

THE COURT: What do you have to do with the proceeding?

THE WITNESS: I don't. I represent someone who may have some interest in some of the representation (sic) that Mr. Klein may make.

MR. KLEIN[ ]: May I ask who, Your Honor?

THE COURT: So who are you here on behalf of.

THE WITNESS: I'm on behalf of a law firm, Your Honor.

THE COURT: Which one?

THE WITNESS: Mannion Prior, a law firm out of King of Prussia.

THE COURT: Who do they represent? Do you know?

MR. KLEIN[ ]: They represent Mr. Donatucci, Your Honor. Thank you.

THE COURT: Okay.

MR. KLEIN[ ]: And for the record, the Stradley Firm that represents Mr. McGarry - - [also represents Donatucci in the above-referenced "Chester County Action"]

MR. O'MARA [of the Stradley Firm]: Your Honor, I don't know that (sic) true. I heard that last week [when it was raised by Mr. Klein]. I've been unable to confirm that. I too want to make clear that I'm not necessarily agreeing with that representation.

THE COURT: Thank you, Mr. O'Mara.

MR. KLEIN[ ]: The case is pending in Chester County before Judge Wheatcraft [(i.e., the above-referenced "Chester County Action")] and two lawyers have

appeared [from] the Stradley Firm on behalf of Mr. Donatucci [against the Executrix of Michael's Estate].

THE COURT: Who are they?

MR. KLEIN[ ]: Mr. DeGeorgio (sic) was one of the names.

MR. O'MARA: He's an attorney in my law firm.

MR. KLEIN[ ]: His appearance is entered of public record. Is there a Samantha Kats?

MR. O'MARA: There is an attorney at our firm by that name.

MR. KLEIN[ ]: She also appeared and she also appeared [in] the McGarry Estate on behalf of Mr. McGarry. So everyone here knows each other. Getting back to the point that Mr. Kent [(attorney for Mr. Feltoon)] was speaking about. Nothing in my affidavit waived the attorney/client privilege. I raised something that is pending in a public record [(Mr. Donatucci's threat that Mr. Feltoon's law firm's reputation would be harmed if the firm continued to represent the Executrix of Michael's Estate)], in a matter involving my daughter, as executrix to Michael Donatucci's estate. And I submit the linkage there needs to be addressed. It needs to be addressed because it is the only reason, the only, contained (sic), the only reason that Mr. Feltone (sic) sought to withdraw. There could be no other reason. They know that. . . .

Transcript June 11, 2018 hearing at 19:6 – 21:21 (excerpts of which are attached as **Exhibit "B"**; references are to "page number: line number(s)") (hereinafter Tr. 6-11-18, __:__).

194.    The Court ruled that Feltoon was authorized to introduce (without any limitation) underline(privileged communications) regarding Michael's Estate (as well as the *McGarry Estate*) as

evidence at the hearing, despite the fact that such disclosure would be occurring in the presence of Donatucci's counsel (the law firms of Stradley Ronon Stevens & Young, LLP and Mannion Prior, LLP) to the extreme prejudice and detriment of both the *McGarry Estate* and Michael's Estate, including pending litigation with Mr. Donatucci. Judge Sarmina failed to minimize the harm that would have otherwise been caused to both Estates had Mr. Klein forgone his fiduciary duties to the Estates and allowed the proceeding to continue as the Court proposed. This is further supported by the fact that such disclosure of unlimited privileged communications was not relevant to the issue before the Court, i.e., Donatucci's threat to Feltoon, which led to Feltoon's withdrawing from Michael's Estate and petitioning to withdraw from the *McGarry Estate*.

195.    As a result of this ruling, the Executrix's father under duress and, in the words of Judge Sarmina, "in between a rock and hard place" (Tr. 6-11-18, 47: 6-7 (**Ex. B**)), was forced to withdraw his opposition to Feltoon's petition, resulting in the Stradley Ronon firm taking unfair advantage of the *McGarry Estate* in a settlement agreement by which it will be able to 1) take over the estate administration and, being left to their own devices, gouge funds from the *McGarry Estate* for alleged fees without substantiation, and 2) cheat Meghan's father and his law firm (who have never been paid for their legal services since 2011) out of being reimbursed substantial attorneys' fees and costs they are long owed, having been incurred on behalf of the *McGarry Estate*. Meghan's father (Administrator D.B.N. in the *McGarry Estate*) is forced to continue to proceed with the settlement despite these facts, in view of the unfair financial burden it has caused him and his law firm.

196.    Pursuant to an Order issued by Civil Trial Division Judge Sarmina, Feltoon's appearance in the *McGarry Estate* was withdrawn in June 2018.

197.    The proceedings in the *McGarry Estate* with respect to Feltoon's petition to withdraw reflect an appearance of impropriety that could have (and should have) been avoided had the Court recused itself as Judge Carrafiello had apparently warned then President Judge Woods-Skipper last March. **Ex. A**, p. 1.

198.    After the Executrix's father was severely prejudiced by the Court's handling of Feltoon's petition to withdraw in the *McGarry Estate,* in a letter of December 14, 2018 to the Superior Court in regard to the *McGarry Estate* (**Ex. A**) presiding President Judge Fox stated, the Court now is "prepared to submit a request to the Supreme Court for the appointment of an out of county judge" to rule on the Joint Petition to approve the settlement in the *McGarry Estate*. This letter was sent to the Superior Court only after Judge Carrafiello referred the Joint Petition to Judge Sarmina on November 27, 2018, in light of her having handled the June 11, 2018 hearing. *See* letter from Judge Carrafiello dated November 27, 2018, together with an Order of the Superior Court dated November 19, 2018 and related acknowledgements of receipt of that Order signed by Judge Carrafiello and Judge Sarmina, attached hereto as **Exhibit "C"**.

199.    It appears from her letter that President Judge Fox is now of the view that an out-of-county judge must preside over the *McGarry Estate* in view of the Executrix's father's involvement, even though Judge Carrafiello previously notified her predecessor that an out-of-county judge should have been appointed to decide Feltoon's petition to withdraw from the *McGarry Estate*. It is unclear why Judge Fox, who appeared at the June 11, 2018 hearing and appears was aware of the predicament raised by the proceeding, believes it was proper for a Civil Trial Division Judge in Philadelphia to hear Feltoon's petition to withdraw (**Ex. A**, n.1), but that the same Judge should not preside over a petition to approve the settlement in the *McGarry Estate*, particularly when

Feltoon's petition to withdraw at least equally involved details of the Orphans' Court proceedings with significant implications in both the *McGarry Estate* and Michael's Estate.

200.    Especially in light of President Judge Fox's recent letter, no Judge of the Court of Common Pleas of Philadelphia should have presided over proceedings regarding Feltoon's petition which involved improper conduct of one of the court's own officials, Register and Orphans' Court Clerk Donatucci. The Court's ruling in favor of Feltoon resulted in the *McGarry Estate* and its Administrator D.B.N. being left without counsel in the Orphans' Court proceedings (no reasonable lawyer is willing to substitute their appearance for Feltoon in the *McGarry Estate*, especially in view of the extensive pending litigation in Michael's Estate involving Donatucci), which led Meghan's father to be forced to settle under duress and yet to still not be paid for services rendered dating back to 2011.

### L.    THE ESTATE IS BEING UNFAIRLY PREJUDICED BY THE STATE COURT DUE TO DONATUCCI'S REPEATED INAPPROPRIATE INFLUENCE

201.    Comments by the Court of Common Pleas during a hearing held on December 14, 2018 in the slip and fall case against the Estate's 20th Street Property revealed an unacceptable appearance of impropriety and unfair bias against the Estate, and the Court's actions in that regard caused the Estate to be forced to agree to pay a settlement of the claim, after the claimant had already agreed that no payment would be required from the Estate. The claim dated back to a period before Michael purchased insurance for the property, and as a result the claim was not insured. The Estate is now forced to pay the settlement out of its own funds. This result furthers Donatucci's strategy to wear down the Plaintiffs by depleting Meghan's and the Estate's funds to force Meghan to agree to his terms for him to obtain Michael's Commonly-Held Realty Interests for a cheap price.

202.    This is a perfect example of why a partitioning of Michael's Commonly-Held Realty Interests cannot be determined in the state court system and must be done through this Federal Court.

203.    During the hearing in the slip and fall case, the state court showed <u>bias against the Estate</u> by providing an unwarranted and improper advisory opinion against the Estate after the claimant had already agreed to accept a settlement from the Estate's co-defendant and dismiss the claim against the Estate.

204.    The state court Judge's bias was evident almost immediately as she instructed the Estate's counsel to refer to his client as "Klein," *not* the Donatucci Estate (despite the fact that Plaintiff's claim is against the Executrix, solely in her capacity as Executrix of Michael Donatucci's Estate), indicating that the Estate's counsel should stop "bringing Donatucci's name into this - - [because] neither he nor his family are in my case." The state court also insisted on referring to <u>the Estate's Property</u> at issue in the case as the "Klein property," which it is not.

205.    At the conclusion of the hearing, the state court Judge added "I'm sure that [counsel for the Estate] will order the transcript [of the December 14, 2018 hearing] so that not only the Court but the plaintiff can get it. I'd like to keep the costs down to a minimum to the plaintiff here." This statement of the Judge is troubling given the matters at issue in the case and shows a completely unsubstantiated bias in favor of the claimant and against the Estate.

206.    The state court Judge even went as far as to single out Meghan's father, who was not counsel of record on the case or participating in the hearing that day (but was merely in attendance at the December 14, 2018 hearing on behalf of the Estate), to reprimand him for allegedly "using up whatever money is in the estate," as if the Estate's preparing a defense to a major jury action

and proffering evidence, as it did, to substantiate claims of the Estate for fraud and abuse of process for an illegitimate slip and fall case, was wasteful.

207.    The combination of the advisory opinion pre-judging the case against Meghan along with the other inappropriate comments by the state court Judge, are indicative of Donatucci's influence which undermines Meghan's confidence in the state court system.

**COUNT I**
**AGAINST DONATUCCI**
*In his Capacity as Register of Wills of the City of Philadelphia and Orphans' Court Clerk*
*and in his Individual Capacity*
**42 U.S.C. § 1983 – Equal Protection – Class of One**

208.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

209.    Donatucci's actions consist of a disturbing pattern of deliberate and unjustified official harassment actionable under the Equal Protection Clause of the Fourteenth Amendment.

210.    The Equal Protection Clause is intended to protect against purely arbitrary government classifications, even when a classification consists of singling out just one person, as is the case here, with different treatment for arbitrary and irrational purposes. Meghan was intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.

211.    Donatucci's actions, the product of subjective ill-will, were deliberately discriminatory. He probated Michael's Will with no intention of honoring the privilege granted by the probate and fully intending to use his power and knowledge as Register to undermine Meghan for his own gain.

212.    Donatucci's actions following the probate through the present were taken for vindictive and harassing purposes, i.e., they were retaliatory and intended to advance his own personal interests (including financial interests to the detriment of the Estate). His actions were malicious

58

and intentional and constitute an abuse of his office, wherein his personal agenda was consistently put ahead of his duties as Register.

213.    As shown above, at relevant times Donatucci was clothed with and was using the authority that he possessed of the City of Philadelphia and Commonwealth of Pennsylvania in his positions of Register of Wills and Clerk of the Orphans' Court Division of the Court of Common Pleas of Philadelphia, and used and misused his power and authority of the state.

214.    As shown above, at relevant times Donatucci exercised power possessed by virtue of state law and made possible only because he was clothed with the authority of state law.

215.    As shown above, there is a sufficiently close nexus between the state and Donatucci's actions so that his actions may fairly be treated as that of the state itself.

216.    The state created the legal framework governing Donatucci's conduct, and his conduct is fairly attributable to the state.

217.    As shown above, Donatucci's wrongful actions involve treatment of Plaintiffs departing from the norm or common practice regarding his and the office of the Register of Wills' role in regard to probate of wills and administration of estates.

218.    Donatucci intentionally treated Meghan differently than others similarly situated whom his office serves.  He not only failed to uphold the validity of the Will which his office conferred upon probate but also failed to honor the position he granted to Meghan as Executrix or Personal Representative of the Estate by virtue of the probate and letters testamentary granted.

219.    There was no rational basis for the difference in treatment that began almost immediately following his judicial decision.

220.    The pattern of conduct by Donatucci is not a legitimate exercise of discretion in his official positions as an employee of the state.

221.    There was no rational or proper purpose for appealing his own decision to admit Michael's Will to probate and meddling in the Estate. Other Personal Representatives of estates probated and administered in Philadelphia and in Pennsylvania are not similarly treated and abused.

222.    Donatucci was motivated by illegitimate animus and ill-will against Meghan.

223.    Donatucci's actions were wanton, malicious, outrageous, and conducted with full knowledge of the law and exhibited reckless indifference to the foreseeable risks of harm to Meghan and the Estate.

224.    As a result of the foregoing, the Estate has suffered and continues to suffer damages, including but not limited to compensatory, punitive and consequential damages, including but not limited to value of property damaged or destroyed, value of legal services reasonably needed and obtained to deal with Donatucci's repeated and ongoing conduct, prejudgment interest, and a sum commensurate with punishing Donatucci for his evil motive or intentional behavior driven primarily by desire for gain, or reckless and callous disregard for, and malicious and wanton violations of Plaintiffs' constitutional rights, for his intentionally inducing others to participate in such conduct, and to deter Donatucci and others like him from doing similar things in the future.

225.    As a result of the foregoing, Meghan has suffered and continues to suffer damages, including but not limited to those items of damages referred to in the paragraph above, emotional harm, fear, humiliation, ridicule, mental anguish, pain and suffering, medical expenses, lost wages, reasonable value of the working time, and damage to her professional career.

        **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT II
## AGAINST THE CITY OF PHILADELPHIA
### 42 U.S.C. § 1983 – Equal Protection – Class of One

226.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

227.    Donatucci's practices in his office constitute a standard operating procedure of the City. The City, including its Court of Common Pleas, fails to properly supervise Donatucci, allows him to have policymaking authority in the office of the Register of Wills and the office of the Clerk of the Orphans' Court, and is deliberately indifferent to Donatucci's use of his office for personal gain, as a result of which the deprivation of Plaintiffs' constitutional rights is an obvious consequence of the City's choice to allow Donatucci's conduct to continue.

228.    Such practices effect a policy or custom, which in this case was the moving force behind the violations of Plaintiffs' constitutional rights which caused and is continuing to cause injury to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against the City and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT III
## AGAINST DONATUCCI AND THE CITY OF PHILADELPHIA
*Against Donatucci in his Capacity as Register of Wills of the City of Philadelphia and Orphans' Court Clerk and in his Individual Capacity*
### 42 U.S.C. § 1983 – Substantive Due Process, Egregious Abuse of Power

229.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

230.    Donatucci, exercising his official authority and acting under color of state law, and the City by virtue of its deliberate indifference to Donatucci's conduct, as set forth throughout this Complaint, repeatedly and with malice sabotaged and fabricated facts, meddled in Plaintiffs'

affairs, threatened, extorted and contrived claims, failed to comply with court orders, and stole, withheld, altered and/or destroyed Plaintiffs' property due to personal and political motivation, depriving Plaintiffs of equal protection of the law.

231.    Donatucci has betrayed and continues to betray the grant of discretion in his positions as an employee of the state by deliberately targeting Plaintiffs for harassment, which violates Plaintiffs' constitutional rights to due process, to which the City is deliberately indifferent and has turned a blind eye, and for which 42 U.S.C. § 1983 provides a remedy.

232.    Donatucci's and the City's conduct and violations of Plaintiffs' rights as described throughout this Complaint was and continues to be an egregious arbitrary abuse of government power that shocks the conscience, to which the City and its officials and courts have turned a blind eye and/or are indifferent or complicit, and which has caused and is continuing to cause injury to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and the City, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

### COUNT IV
### AGAINST DONATUCCI AND THE CITY OF PHILADELPHIA
*Against Donatucci in his Capacity as Register of Wills of the City of Philadelphia and Orphans' Court Clerk and in his Individual Capacity*
### 42 U.S.C. § 1983 – Violations of Free Speech and Access to Courts under First, Fifth, and Fourteenth Amendments

233.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

234.    Donatucci's actions above under color of state law and the City's indifference to such actions by Donatucci violate Plaintiffs' constitutional rights to free speech and access to the courts

provided by the First, Fifth and Fourteenth Amendments of the United States Constitution, including but not limited to the following:

- Threatening and interfering with Plaintiffs' counsel, impacting their rights to access to the courts in violation of the First, Fifth and Fourteenth Amendments.

- Harassing and retaliating against Plaintiffs for exercising their First Amendment rights to free speech and access to the courts, Fifth and Fourteenth Amendment rights to due process and equal protection in filing the Penn Peak Dissolution Case on June 30, 2017 regarding a property in which Donatucci had no legal or equitable interest, in filing the Removal Petition in his ex-wife's name and the Will Contest appealing his judicial decision as Register to probate Michael's Will as being valid and enforceable.

- Harassing and retaliating against Plaintiffs for exercising their First Amendment rights to free speech and access to the courts in testifying in the Penn Peak Dissolution Case on August 18, 2017.

- The taunting and harassing of Plaintiffs in the courtroom in the Chester County Action on September 18, 2017 in retaliation for pursuing their legal rights in the courts, in violation of their rights under the First, Fifth and Fourteenth Amendments.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and the City, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT V
## AGAINST DONATUCCI AND THE CITY OF PHILADELPHIA
*Against Donatucci in his Capacity as Register of Wills of the City of Philadelphia and Orphans' Court Clerk and in his Individual Capacity*
## 42 U.S.C. § 1983 – Violations of Rights Against Deprivation or Taking of Property Without Due Process under Fifth and Fourteenth Amendments

235.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

236.    Under the Takings Clause of the Fifth Amendment to the United States Constitution, which applies to the several states, as well as the Fourteenth Amendment, the State of Pennsylvania cannot take private property for public use without justly compensating the private property owner.

237.    Donatucci's actions above under color of state law and the City's deliberate indifference to such actions by Donatucci violate Plaintiffs' constitutional rights against the taking of property without due process provided by the Fifth and Fourteenth Amendments of the United States Constitution, including but not limited to the following:

- Entering the apartment Meghan and Michael shared without permission and taking Meghan's and Michael's belongings.

- Using city employees (including DiGregorio, Catalano and her husband, and Ruth) to remove Meghan's and Michael's belongings, including files and records regarding the Estate, and to manage real estate in which Donatucci, Donatucci Jr., and Michael or his Estate have interests (including city employees DiGregorio and Samantha Valtri), by which Donatucci took Meghan's and the Estate's property and also took rents belonging to Plaintiffs without due process, right, public purpose, or just compensation, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and the City, jointly and severally, and award Plaintiffs compensatory, punitive

and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT VI**
**AGAINST ALL DEFENDANTS EXCEPT THE CITY and REAL ESTATE ENTITIES**
*Against Donatucci in his Capacity as Register of Wills and Clerk of the Orphans' Court*
*and in his Individual Capacity*
**42 U.S.C. § 1983 – Civil Conspiracy**

238.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

239.    Defendants, except the City, Ronald, Michael Ronald, L.P., and RRM Associates, LLC, have and continue to willfully participate in joint action to deprive Plaintiffs of their constitutional rights.

240.    Such Defendants acted and are continuing to act in concert pursuant to an agreement to deprive Plaintiffs of their constitutional rights.

241.    Such Defendants have and continue to conspire and act together to scheme and carry out a common plan to extort and take money and property of Plaintiffs, burden Plaintiffs with legal expenses and wear down Plaintiffs to hinder or prevent them from pursuing a proper partitioning of Michael's Commonly-Held Realty Interests, and coerce unfairly Plaintiffs to accept Donatucci's demands.

242.    Such Defendants knowingly and intentionally have and continue to scheme and work together in their common plan and are depriving Plaintiffs of their constitutional rights.

243.    As described above, Plaintiffs have and continue to suffer harm and injury as a result of the foregoing Defendants' continuing conspiracy to deprive her of her constitutional rights.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Foglietta, DeSimone, WSFS,

Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT VII**
**AGAINST DONATUCCI AND THE CITY OF PHILADELPHIA**
*Against Donatucci in his Capacity as Register of Wills of the City of Philadelphia and*
*Orphans' Court Clerk and in his Individual Capacity*
**Violations of Free Speech and Access to Courts, and Deprivation and Taking of Property**
**Without Due Process under the Constitution and Laws of**
**the Commonwealth of Pennsylvania**

244.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

245.    Donatucci's actions above under color of state law violate Plaintiffs' constitutional rights to free speech and access to the courts, and against deprivation of property without due process provided by the Constitution of the Commonwealth of Pennsylvania, including as provided under Article I thereof and by the laws of the Commonwealth of Pennsylvania.

    **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and the City, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT VIII**
**AGAINST ALL DEFENDANTS EXCEPT THE CITY, DONATUCCI JR., and**
**REAL ESTATE ENTITIES**
*Against Donatucci in his Individual Capacity Only*
**Abuse of Process**

246.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

247.    Defendants, not including the City, Donatucci Jr., Ronald, Michael Ronald, L.P., and RRM Associates, LLC, used and/or continue to use the  Will Contest and Removal Petition litigation and/or the Chester County Action solely to falsely conjure up claims, collude, and leverage and carry out an extortion scheme by which they improperly stymied and delayed the Estate's administration, interfered with and/or have wrongly taken property of the Estate, failed to comply with rules of court and multiple court orders, and attempted to unfairly leverage and deliberately needlessly increased Plaintiffs' legal fees and costs to force a deal for themselves.

248.    The above-described actions were taken by such Defendants solely as a tactical weapon to coerce a result that is not the legitimate object of the legal process, including, but not limited to, unfairly delaying or prolonging the litigation process in order to improperly stymie and delay, unfairly leverage, needlessly increase Plaintiffs' legal fees and costs, put pressure upon Plaintiffs in order to compel them to accept their demands, and were intended to and in fact did cause harm to Plaintiffs.

249.    Such Defendants employed the use of court process and are continuing to do so through their pursuit of the Removal Petition and claims and averments in the Chester County Action as a tactical weapon to coerce a desired result that is/was not the legitimate object of the process.

250.    Plaintiffs have suffered, and continue to suffer, substantial damages and irreparable harm as a result of the unlawful acts of such Defendants, as described above.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Foglietta, DeSimone, WSFS, and Brimfield/Siu, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-

judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT IX
## AGAINST DONATUCCI, MANNION, and MANNION PRIOR
### *Against Donatucci in his Individual Capacity Only*
### Malicious Prosecution

251.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

252.    This count is for wrongful use of civil process or proceedings and arises under common law and the Dragonetti Act, 42 Pa. C.S. § 8351 *et seq.*

253.    Defendants Donatucci, Mannion, and Mannion Prior knowingly and intentionally initiated challenges and interference with the Estate following probate of Michael's Will, and the meritless Will Contest (i.e., the appeal of Donatucci's own decision to admit Michael's Will to probate and issuance of letters testamentary to Meghan as Executrix of the Estate).

254.    These challenges and interference with the Estate following probate and the Will Contest terminated in favor of Plaintiffs. Neither Donatucci nor Mannion and Mannion Prior were attempting to properly adjudicate their claims, and they did not answer the bell in the fight they started, which is a favorable determination for Plaintiffs.

255.    Defendants Donatucci, Mannion, and Mannion Prior knew when they instituted, initiated, procured and continued all such proceedings that their claims and/or appeal were meritless or without probable cause and made, instituted or filed for improper purposes.

256.    Defendants Donatucci, Mannion, and Mannion Prior, at all relevant times, acted in a grossly negligent manner and intended the claims for improper and wrongful purposes.

257.    Notwithstanding their knowledge that the claims were meritless, Defendants Donatucci, Mannion, and Mannion Prior nonetheless procured, initiated and continued all such proceedings against Plaintiffs.

258.    Defendants Donatucci, Mannion, and Mannion Prior, at all relevant times, knew their challenges and interference with the Estate following probate and the Will Contest were without factual or legally cognizable basis, and were solely to falsely conjure up and leverage an extortion scheme.

259.    Defendants Mannion and Mannion Prior acted without probable cause for belief in the possibility that the claims will succeed, and for an improper purpose, including to put pressure upon Plaintiffs in order to compel Plaintiffs' acceptance of Donatucci's demands as a result of which Mannion and Mannion Prior would also benefit, and solely to harass Plaintiffs by bringing claims known to be invalid, and as such Mannion and Mannion Prior, as well as Donatucci, are liable to Plaintiffs.

260.    Defendants Donatucci, Mannion, and Mannion Prior, at all relevant times, knew the challenges and interference with the Estate following probate and the Will Contest were baseless and were intended to, and in fact would cause harm to Plaintiffs, and no evidence to support those claims was ever introduced.

261.    Defendants Donatucci, Mannion, and Mannion Prior challenged and interfered with the Estate following probate and filed the Will Contest solely to improperly stymie and delay the Estate's administration, harass, bully, threaten, and intimidate Plaintiffs and their counsel, and unfairly leverage and needlessly increase Plaintiffs' legal fees and costs and other harm to force a deal for themselves.

262.    Defendants Donatucci, Mannion, and Mannion Prior reasonably should have known they had no legally cognizable basis for the claims asserted, including the Will Contest.

263.    Defendants Donatucci, Mannion, and Mannion Prior knew or should have known that the claims and proceedings they initiated, advanced and/or supported was a wrongful use of the civil

process of the Orphans' Court and were being used and, in fact, were used, solely to falsely conjure up and leverage an extortion scheme by which they improperly stymied and delayed the Estate's administration, and attempted to unfairly leverage and deliberately needlessly increase Plaintiffs' legal fees and costs and other harm to force a deal for themselves.

264.    Defendants Donatucci, Mannion, and Mannion Prior by actively taking part in the procurement, initiation and/or continuation of their challenges and interference with the Estate following probate and the Will Contest and related proceedings against Plaintiffs, acted in a grossly negligent manner, without probable cause, with malice, and primarily for a purpose other than that of securing proper discovery, joinder of parties, or adjudication of the claims during the course of the proceedings regarding the Estate following probate of Michael's Will and in the Will Contest.

265.    Defendants Donatucci, Mannion, and Mannion Prior procured, initiated and/or continued the Will Contest without reasonably believing in the existence of any facts upon which the claims were based, solely for improper purposes of conjuring up and leveraging an extortion scheme by which they improperly stymied and delayed the Estate's administration, and attempted to unfairly leverage and deliberately needlessly increased Plaintiffs' legal fees and costs and other harm to force a deal for themselves, all to the detriment of Plaintiffs.

266.    Defendants Donatucci, Mannion, and Mannion Prior knew or should have known that their challenges and interference with the Estate following probate and the Will Contest they initiated, advanced and/or supported against Plaintiffs were primarily for a purpose other than that of securing proper discovery, joinder of parties, or adjudication of the claims.

267.    Defendants Donatucci, Mannion, and Mannion Prior all knew their challenges and interference with the Estate following probate and the Will Contest were groundless in fact and

under existing or developing law, and were intended to merely harass and/or maliciously injure Plaintiffs.

268.    Defendants Donatucci, Mannion, and Mannion Prior actively took part in the procurement, initiation and/or continuation of their challenges and interference with the Estate following probate and the Will Contest and related proceedings knowing they were for improper purposes – including, but not limited to, putting pressure upon Plaintiffs in order to compel them give up their rights under Michael's probated Will and/or solely to harass or maliciously injure Plaintiffs – by actively engaging in and supporting the claims with, *inter alia*, the lack of slight diligence or care, conscious and with voluntary acts or omissions in reckless disregard of their legal duties and of the consequences to Plaintiffs, and want of even scant care, without exercising even that care which a careless person would use.

269.    The actions of Defendants Donatucci, Mannion, and Mannion Prior described above are unlawful under 42 Pa. C.S. § 8351 *et seq.*

270.    Plaintiffs have suffered, and continue to suffer, substantial damages and irreparable harm as a result of the unlawful acts of Defendants Donatucci, Mannion, and Mannion Prior, including, but not limited to, harm resulting from the dispossession and/or interference with the advantageous use of Plaintiffs' property and things suffered by Plaintiffs during the course of the proceedings regarding this Estate following probate of Michael's Will and through the proceedings regarding the Will Contest, the harm to Plaintiffs' reputation by defamatory matter alleged as the basis of all such proceedings, the expense, including attorneys' fees and expenses incurred and owing in connection with all such proceedings, all other pecuniary losses resulting from all such proceedings, emotional distress that has and continues to be caused by all such proceedings and matters related thereto, and punitive damages.

71

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci, Mannion, and Mannion Prior, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, all damages set forth above and recoverable pursuant to 42 Pa. C.S. § 8353 and under applicable law, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT X**
**AGAINST ALL DEFENDANTS EXCEPT THE CITY**
**and REAL ESTATE ENTITIES**
*Against Donatucci in his Individual Capacity Only*
**Conspiracy**

271.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

272.    All Defendants, not including the City and Ronald, Michael Ronald, L.P., and RRM Associates, LLC, have and continue to willfully participate in joint agreement and action to deprive Plaintiffs of their rights as Executrix and beneficiary of the Estate.

273.    Such Defendants acted in concert pursuant to an agreement to deprive Plaintiffs of their rights.

274.    Such Defendants conspired and acted together to scheme and carry out a common plan to extort and take money and property of Plaintiffs, including burdening Plaintiffs with legal expenses and wear down Plaintiffs to hinder or prevent them from pursuing a proper partitioning of Michael's Commonly-Held Realty Interests, and coerce unfairly Plaintiffs to accept Donatucci's demands.

275.    Such Defendants knowingly and intentionally have and continue to scheme and worked together in their common plan against Plaintiffs for unlawful purposes for the benefit of themselves and to the detriment of Plaintiffs, as described above.

276.    As described above, Plaintiffs have and continue to suffer harm and injury as a result of the foregoing Defendants' continuing conspiracy to deprive them of their rights as Executrix and beneficiary of the Estate.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT XI
### AGAINST DONATUCCI, MANNION, MANNION PRIOR, and FOGLIETTA
*Against Donatucci in his Individual Capacity Only*
### Defamation

277.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

278.    Donatucci, Mannion, Mannion Prior, and Foglietta falsely accused Plaintiffs of committing perjury by reporting false information in the inheritance return.

279.    Donatucci, Mannion, Mannion Prior were the source of similar and other false and defamatory statements that they and Foglietta continue to make in the Removal Petition. As noted above, while the Removal Petition was falsely filed in Donatucci's ex-wife's name (Donatucci had no standing to raise any of the issues in the Removal Petition since he is not a beneficiary under Michael's Will), Donatucci, Mannion, and Mannion Prior are the source of the allegations, including the defamatory statements, in that Petition that continue to be made.

280.    On information and belief, Donatucci and Foglietta made similar false statements about Plaintiffs to the Pennsylvania Department of Revenue.

281.    Such statements and/or accusations of Donatucci, Mannion, Mannion Prior, and Foglietta are defamatory per se and actionable per se and have caused and continue to cause harm and are presumed to be causing such harm to Plaintiffs and their reputation, as well as embarrassment, mental anguish, and humiliation.

282.    Also, on information and belief, Foglietta has made and continues to make false statements about Plaintiffs in electronic communications and social media, including, but not limited to, on Facebook, that have caused and continue to cause harm to Plaintiffs and their reputation, as well as embarrassment, mental anguish, and humiliation.

283.    As a result of the foregoing, Donatucci, Mannion, Mannion Prior, and Foglietta are liable to Plaintiffs for substantial compensatory, consequential, and exemplary or punitive damages.

   **WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, and Foglietta, jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

## COUNT XII
## AGAINST ALL DEFENDANTS EXCEPT THE CITY
## and REAL ESTATE ENTITIES
### *Against Donatucci in his Individual Capacity Only*
### Intentional Infliction of Emotional Distress

284.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

285.    As alleged above, all Defendants' conduct (not including City, Ronald, Michael Ronald, L.P., and RRM Associates, LLC) was extreme and outrageous; they acted with an intent to cause Meghan severe emotional distress or with reckless disregard that such conduct would cause severe emotional distress.

286.    Particularly in light of the circumstances of Michael's death, such Defendants actions went so beyond the bounds of decency that they give rise to a claim of intentional infliction of emotional distress.

287.    Meghan actually suffered extreme emotional distress as a result of such Defendants' actions.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants Donatucci, Mannion, Mannion Prior, Foglietta, DeSimone, WSFS, Brimfield/Siu, and Donatucci Jr., jointly and severally, and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT XIII**
**AGAINST DONATUCCI**
*In his Individual Capacity Only*
**Conversion / Wrongful Appropriation / Theft / Embezzlement**

288.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

289.    Donatucci has taken money and property belonging to Plaintiffs without right or justification.

290.    Despite demand for delivery of such money and property made by Plaintiffs and the court orders compelling the same, Donatucci has failed and refused to turn over such money and property.

291.    As a direct and proximate result of this conversion, wrongful appropriation, theft, and embezzlement of such money and property, Plaintiffs have suffered substantial damages, including but not limited to compensatory damages, consequential damages consisting of, among other things, attorneys' fees and costs.

292.    Donatucci's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs. Such conduct warrants an award to Plaintiff of punitive or exemplary damages in an amount sufficient to punish Donatucci and deter similar wrongdoing by others.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and award Plaintiffs compensatory, punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT XIV**
**AGAINST DONATUCCI AND DONATUCCI JR.**
*Against Donatucci in his Individual Capacity Only*
**Trespass**

293.    Plaintiffs incorporates the above paragraphs as if fully set forth herein.

294.    Donatucci and Donatucci Jr., individually or through his agents acting at his direction, unlawfully entered Michael and Meghan's apartment, removed items or property from the apartment, and changed the locks on the apartment, without Plaintiffs' consent.

295.    As a direct and proximate result of this tespass, Plaintiffs have suffered substantial damages, including but not limited to compensatory damages, consequential damages consisting of, among other things, attorneys' fees and costs.

296.    Donatucci's and Donatucci Jr.'s actions have been willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs.

297.    Such conduct warrants an award to Plaintiffs of punitive or exemplary damages in an amount sufficient to punish Donatucci and Donatucci Jr. and deter similar wrongdoing by others.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment against Donatucci and Donatucci Jr., jointly and severally, and award Plaintiffs compensatory,

punitive and consequential damages as set forth above, attorneys' fees and costs, pre-judgment and post-judgment interest, and such other additional relief that this Honorable Court deems just and equitable.

**COUNT XV**
**AGAINST DONATUCCI SR., DONATUCCI JR., RRM ASSOCIATES, LLC, AND RONALD, MICHAEL AND RONALD, L.P.**
**Partition**

298.   Plaintiffs incorporates the above paragraphs as if fully set forth herein.

299.   The Pennsylvania Rules of Civil Procedure provide that any co-tenant owning real estate with other co-tenants may bring an action for partition of the property.  Pa. R. Civ. P. 1551 et seq. (the "Partition Rules").

300.   Pa. R. Civ. P. 1551 provides that "the procedure in an action for the partition of real estate shall be in accordance with the rules relating to the civil action."

301.   Pa. R. Civ. P. 1553 provides that "[a]n action for partition may be brought by any one or more co-tenants."  "All other co-tenants shall be joined as defendants." Pa. R. Civ. P. 1553.

302.   The Partition Rules provide that such actions "may be brought in and only in a county in which all or any part of any property which is the subject matter of the action is located."  Pa. R. Civ. P. 1552. "The complaint shall include (a) a description of the property and (b) a statement of the nature and extent of the interest of each party in the property." Pa. R. Civ. P. 1552.

303.   Pa. R. Civ. P. 1555 provides that "[t]he plaintiff may state in the complaint causes of action for the partition of all or any part of any properties in which the plaintiff and the defendants are co-tenants, irrespective of their location in the Commonwealth or of the proportion of the plaintiff's interest in the several properties."

304.    Michael, together with his father, Donatucci, and brother, Donatucci Jr., was co-tenant of numerous real estate properties in Philadelphia, individually as co-tenants, as well as through a limited liability company, RRM Associates, LLC, and Ronald, Michael and Ronald, L.P.

305.    For purposes of Pa. R. Civ. P. 1552, below is a description of each property and a statement and nature of the extent of the interest of each party in the property:

| | |
|---|---|
| 4537 Spruce Street | Tenants in common (Michael, Donattuci Sr. and Donatucci Jr.) |
| 1425 Spruce Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1179-81 S. 13th Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1541 S. 13th Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 2249 S. 21st Street | Tenants in common (Michael, Donattuci Sr. and Donatucci Jr.) |
| 1615-17 Porter Street | ***Ronald, Michael and Ronald, L.P.*** |
| 1907 S. Broad Street | Tenants in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1402 E. Moyamensing Avenue | ***RRM Associates, LLC*** |
| 1030-32 Colorado Street | ***RRM Associates, LLC*** |
| 1214 Annin Street | Tenant in common (Michael, Donatucci Sr. and Donatucci Jr.) |
| 1507-09 E. Moyamensing Avenue, Units A-C | ***RRM Associates, LLC*** |

306.    The description of each aforementioned property is set forth in each property's deed.  The deeds for these properties are attached to this Complaint as **Exhibit D**.

307.    Plaintiffs have been wrongfully excluded from the aforementioned properties, including by barring Plaintiffs from entering the aforementioned properties, reviewing any books or records

relating to ownership of such books and records, or receiving any rents or other distributions owed to Plaintiffs as a result of their ownership in the aforementioned properties.

308.    As a result of Defendants' actions in wrongfully excluding Plaintiffs from the aforementioned actions, it is no longer practicable for the parties to continue in co-ownership of these properties.

309.    Defendant Ronald, Michael and Ronald, L.P. is a limited partnership with its principal place of business in Philadelphia, Pennsylvania. At the time of Michael's death, the limited partners of Ronald, Michael and Ronald, L.P., in addition to Michael (33%), were Donatucci (33%), and Donatucci Jr. (33%), and the general partner was Donatucci (1%).

310.    Defendant RRM Associates, LLC is a limited liability company with its principal place of business in Philadelphia, Pennsylvania. At the time of Michael's death, the members of RRM Associates, LLC, in addition to Michael (33%), were Donatucci (34%) and Donatucci Jr. (33%). The managing member of RRM Associates, LLC is Donatucci.

311.    Meghan, individually and as Executrix of the Estate of Michael P. Donatucci, brings this cause of action for partition and sale of the aforementioned properties owned in part by Michael, as the rightful beneficiary and/or Executrix of such ownership interests.

   **WHEREFORE**, Plaintiffs demand judgment in Plaintiffs' favor and against such Defendants, either (i) dividing the aforementioned properties among the parties, pursuant to Pa. R. Civ. P. 1560, in accordance with the parties' ownership in the properties; or alternatively (ii) ordering the sale of the aforementioned properties pursuant to Pa. R. Civ. P. 1563 and distributing the proceeds of such sales in accordance with the parties' ownership in the properties. Plaintiffs further demand Plaintiffs' share of the rental value of the properties, as well as an accounting of rents, profits or other benefits received by the other co-tenants due and owing to Plaintiffs, as well

as any liabilities purportedly incurred by Plaintiffs arising out of Plaintiffs' ownership interest in the properties.

## JURY DEMAND

Plaintiff hereby demands trial by jury of twelve as to all claims that may be tried to a jury.

Respectfully submitted,

BERKOWITZ KLEIN, LLP

Date:   March 1, 2019                         By:   _/s/ Robert A. Klein_____
                                              Robert A. Klein, Esquire
                                              Pa. Attorney I.D. No. 44670
                                              629 B Swedesford Road
                                              Swedesford Corporate Center
                                              Malvern, PA 19355-1530
                                              Tel. 610-889-3200
                                              Fax 610-889-9564
                                              Email: rak@berklein.com
                                              *Local Counsel* for Plaintiffs, Meghan E.
                                              Klein, Individually and as Executrix of the
                                              Estate of Michael Philip Thomas Donatucci,
                                              Deceased

Of Counsel:
SCHLAM STONE & DOLAN, LLP
Jeffrey M. Eilender, Esquire
  *Pro Hac Vice Application to be Submitted*
Joshua Wurtzel, Esquire
  *Pro Hac Vice Application to be Submitted*
Seth D. Allen, Esquire
  *Pro Hac Vice Application to be Submitted*
26 Broadway
New York, NY 10004
Tel. 212-344-5400
Fax 212-344-7677
Email: jeilender@schlamstone.com;
jwurtzel@schlamstone.com;
sallen@schlamstone.com
Lead Counsel for Plaintiffs, Meghan E. Klein,
Individually and as Executrix of the
Estate of Michael Philip Thomas Donatucci, Deceased